Craig C. Marchiando (SBN 283829)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel: (757) 930-3660
Fax: (757) 930-3662
craig@clalegal.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**Southern Division**

| | |
|---|---|
| **MELISSA MILLER,** | **Case No.: 8:21-CV-00692** |
|        **Plaintiff,** | Honorable Josephine Staton |
| **v.** | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES,** | |
|        **Defendant.** | **Hearing date:** Oct. 28, 2022<br>**Time:** 10:30 a.m.<br>**Location:** Courtroom 8A |

# TABLE OF CONTENTS

OVERVIEW……………………………………………………………………………………..……….…..1

FACTUAL BACKGROUND……………………………………………………………………Fa...………..2

    I.  Fraudsters Purchase A Car, Westlake Purchases That Contract, And Attributes It To Plaintiff………………………………………………………………………………….2

        A.    Westlake Buys The Contract Despite Being On Notice That The Application Is Suspect……………………………………………………………………………..2

        B.    Plaintiff Had No Connection To The Vehicle Purchase Or Westlake…………………………………………………………………..3

    II.  Plaintiff Disputes The Westlake Account As The Result Of Identity Theft………………………4

    III.  Westlake Does Virtually Nothing To Investigate Plaintiff's Disputes……………………………..5

    IV.  Westlake Never Appends Compliance Condition Codes To Dispute Results……………………..8

    V.  Westlake Undertrains And Overworks Its Dispute Investigators………………………………..…9

    VI.  Westlake Knows Nothing Of Court Decisions Pertinent To FCRA Compliance…………………9

LEGAL FRAMEWORK……………………………………………………………..……….…………10

    I.     Summary Judgment…………………………………………………………………………..10

    II.    The Fair Credit Reporting Act Provisions At Issue…………………………………………..10

    III.   The Pertinent California Consumer Credit Reporting Agencies Act Provisions………….....11

ARGUMENT AND AUTHORITIES………………………………………………………………..…11

    I.     Plaintiff Is Entitled To Judgment As A Matter Of Law On Her FCRA Claim………..……...11

        A.      Plaintiff Establishes All Preliminary Elements Of Her Section 1681s-2(b) Claim...............................................................................................11

            1.     Westlake inaccurately reported the account as belonging to Plaintiff…………....11

            2.     Westlake is a data furnisher, and it furnished credit data about Plaintiff to the credit bureaus……………………………………………..13

            3.     Plaintiff disputed the Westlake account with the CRAs, who

transmitted the disputes to Westlake, and Westlake verified
the account as belonging to Plaintiff each time…………………….....….…..…..13

B.      Westlake's Investigations Of Plaintiff's Disputes Were Unreasonable…………….......14

1.      The FCRA demands a thorough, searching dispute investigation…….................14

2.      Data matching under facts like these is *per se* unreasonable…………………......14

a.      The prevailing decisions find data conformity lacking……………….......14

b.      All Westlake did was compare the identifying information
in the ACDVs with its internal records, which is not enough
when a consumer claims identity theft………............................................16

c.      Westlake unreasonably verified the reporting as accurate
before sending Plaintiff's disputes to its
legal department………...................................................................18

d.      Westlake falsely reported to the CRAs that it verified the
account as belonging to Plaintiff·………...................................................19

C.      Westlake Failed To Note An Appropriate Compliance Condition Code
When It Communicated Its Dispute Results To The CRAs……….…………….……….21

D.      Plaintiff Suffered Actual Damages From Westlake's Conduct…….…………………......22

E.      Westlake's Violations Of The FCRA Were Willful…………………….…………......23

II.      There Are No Disputes Of Material Fact As To Plaintiff's CCRAA Claim…………........24

CONCLUSION…………………………………………………………………………….……......25

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48 (1986)................................................................................................ 10

*Bakker v. McKinnon*,

152 F.3d 1007, 1013 (8th Cir. 1998) .................................................................................... 23

*Biggs v. Experian Information Solutions, Inc.*,

209 F Supp. 3d at 1144 ........................................................................................................ 11

*Boggio v. USAA Fed. Sav. Bank*,

696 F.3d 611 (6th Cir. 2012) .......................................................................................... 16, 22

*Brim v. Midland Credit Mgmt., Inc.*,

795 F. Supp. 2d 1255, 1263 (N.D. Ala. 2011)...................................................................... 16

*Brown v. Vivint Solar, Inc.*,

No. 8:18-cv-2838-T-24 JSS, 2020 WL 1479079, at *5 (M.D. Fla. Mar. 26, 2020) .................... 17

*Carvalho v. Equifax Info. Servs., LLC*,

629 F.3d 876, 890 (9th Cir. 2010) ................................................................................... 11, 25

*Cousin v. Trans Union Corp.*,

246 F.3d 359, 372 (5th Cir. 2001) ........................................................................................ 23

*Cushman v. Trans Union Corp.*,

115 F.3d 220, 226 (3d Cir. 1997)......................................................................................... 23

*Dalton v. Capital Associated Indus.*,

257 F.3d 409, 418 (4th Cir. 2001) ........................................................................................ 23

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

*Daugherty v. Ocwen Loan Servicing, L.L.C.*,

  701 F. App'x 246, 256–57 (4th Cir. 2017) ................................................................................ 16

*Dennis v. BEH-1, LLC*,

  520 F.2d 1066, 1070 (9th Cir. 2008) ......................................................................................... 15

*Drew v. Equifax Info. Servs.*,

  690 F.3d 1100, 1110 (9th Cir. 2012) ......................................................................................... 14

*Felts v. Wells Fargo Bank, N.A.*,

  893 F.3d 1305, 1312 (11th Cir. 2018) ....................................................................................... 15

*Gorman v. Wolpoff & Abramson, LLP*,

  584 F.3d at 1147, 1160–64 (9th Cir. 2009) ................................................................ 11, 14, 15, 22

*Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*,

  758 F.3d 777, 782–83 (6th Cir. 2014) ....................................................................................... 20

*Herrera v. First Nat'l Bank of Omaha, N.A.*, No. CV17-1136 RSWL (SKAx), 2017 WL 6001718, at *2

  (C.D. Cal. Dec. 4, 2017) ............................................................................................................ 10

*Hinkle v. Midland Credit Mgmt., Inc.*,

  827 F.3d 1295, 1303 (11th Cir. 2016) ....................................................................... 14, 15, 20

*Hrebal v. Nationstar Mortg. LLC*,

  385 F. Supp. 3d 849, 852–53 (D. Minn. 2019) .......................................................................... 19

*Johnson v. MBNA Am. Bank, NA*,

  357 F.3d 426, 430-31 (4th Cir. 2004) .................................................................. 13, 14, 15, 17, 21

*Langan v. United Servs. Auto. Ass'n*,

  69 F. Supp. 3d 965, 978 (N.D. Cal. 2014) ................................................................................. 13

*Lopez v. Experian Info. Sols., Inc.*,

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

No. 19-cv-01954-RS, 2022 WL 1569285, at *7 (N.D. Cal. May 18, 2022)................................ 23

*Ma v. Equifax Info. Servs., LLC*,

    288 F. Supp. 3d 1360, 1366 (N.D. Ga. 2017) .......................................................... 18

*Marchisio v. Carrington Mortg. Servs., LLC*,

    919 F.3d 1288, 1301 (11th Cir. 2019) ........................................................... 15, 17, 23

*Prosser v. Navient Sols., Inc.*,

    No. 15-cv-01036-SC, 2015 WL 5168635, at *6–7 (N.D. Cal. Sept. 3, 2015)............................. 14

*Reagan v. Am. Home Mortg. Servicing Inc.*,

    No. C 11-00704 WHA, 2011 WL 2149100, at *3 (N.D. Cal. May 31, 2011)............................. 24

*Reynolds v. Hartford Fin. Servs. Group, Inc.*,

    435 F.3d 1081 (9th Cir. 2006...................................................................... 23

*Robbins v. CitiMortgage, Inc.*,

    No. 16-cv-04732-LHK, 2017 WL 6513662, at *5 (N.D. Cal. Dec. 20, 2017) ........... 11, 14, 15, 24

*Safeco Ins. Co. of Am. v. Burr*,

    551 U.S. 47, 57 (2007)............................................................................ 23

*Saunders v. Branch Banking & Trust Co. of Va.*,

    526 F.3d at 149–50 ............................................................................... 22

*Seamans v. Temple Univ.*,

    744 F.3d 853, 865 (3d Cir. 2014)................................................................ 11, 22

*Soria v. U.S. Bank N.A.*,

    No. SACV17-603 CJC (KESx), 2019 WL 8167925, at *8 (C.D. Cal. Apr. 25, 2019) .......... 14, 17

*Thomasian v. Wells Fargo Bank, N.A.*,

    No. 03:12-cv-01435-HU, 2014 WL 1244892, at *13 (D. Or. Mar. 25, 2014) ........................... 15

*Wood v. Credit One Bank,*

   277 F. Supp. 3d 821, 854–55 (E.D. Va. 2017) ........................................................................ 19, 22

**STATUTES**

California Consumer Credit Reporting Agencies Act, CAL. CIV. CODE §§ 1785.1-1785.36 ............ passim

Fair Credit Reporting Act,15 U.S.C. § 1681s-2(b) .............................................................................. passim

**OTHER AUTHORITIES**

*Am. Heritage Dictionary* 920 (4th ed. 2000) ............................................................................ 14

Black's Law Dictionary 1793 (10th ed. 2014) ....................................................................... 20

Credit Reporting Resource Guide ........................................................................................ 8, 9

Random House Unabridged Dictionary 2113 (2d ed.1993) ..................................................... 20

*Webster's Third New Int'l Dictionary* 1189 (1981) ................................................................. 14

**RULES**

FED. R. CIV. P. 56(c) ......................................................................................................... 10

Plaintiff Melissa Miller has moved the Court for partial summary judgment against Defendant Westlake under Federal Rule of Civil Procedure 56. There are no disputes of material fact on multiple elements of Plaintiff's claims, entitling her to judgment as a matter of law. For the reasons explained below and in Plaintiff's Dist. L.R. 56-1 Statement of Uncontroverted Facts and Conclusions of Law, the Court should grant the Motion.

## OVERVIEW

Plaintiff is the victim of what is, unfairly to consumers, a common crime—identity theft. The problem such a crime poses is that criminals do not steal anything from the consumers; they steal from businesses like Westlake. Those businesses, however, often have such poor internal controls that they make committing such fraud a simple task. But they then make their loss the problem of the innocent consumer by reporting fraudulent accounts to the credit bureaus as belonging to a person with no connection to the account. That is just what happened here.

Fraudsters obtained Plaintiff's personal identifying information, including her name, address, Social Security Number, employer, and a copy of her drivers license, and used that information to purchase a 2015 Ford Fusion from a dealership in Long Beach. The dealership then solicited Westlake (among other potential, competing purchasers) to purchase the fraudsters' contract. As Westlake's Rule 30(b)(6) witness testified, there is intense competition among purchasers of such contracts, which incentivizes them to cut corners and approve purchases of contracts faster than their competitors. In this case, that meant—among other things—failing to check references listed on the application, disregarding fraud alert warnings on application materials, and failing to even confirm that the address given by the fraudsters was actually an apartment complex (it was not). Westlake ill-advisedly purchased the fraudulent contract and, when payments were not made and the account became delinquent, it reported to the credit bureaus that Plaintiff was behind on the payments, and eventually that the account was in "charged-off" status.

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

1

None of this reporting was accurate, as Plaintiff never bought a Ford Fusion and had no relationship with Westlake.

Plaintiff contacted Westlake directly to dispute the inaccurate credit reporting and filed reports with the Huntington Beach Police Department and Federal Trade Commission, to no avail. She then disputed the reporting with the credit bureaus, stating the account was the result of identity theft, and the bureaus provided those disputes to Westlake. Despite statutory duties to conduct searching, meaningful investigations of those disputes and consider all information provided with them, all Westlake did was match the identifying information—Plaintiff's name, address, date of birth, and Social Security Number—in the dispute materials with the information in Westlake's records. Of course that information matched, as that is how identity theft works. Westlake verified the fraudulent account as belonging to Plaintiff again and again, even after Westlake's dispute processors escalated the disputes to the legal department for further investigation into Plaintiff's claims of identity theft.

After Westlake failed to properly investigate Plaintiff's disputes and correct the inaccurate reporting, Plaintiff sued.

FACTUAL BACKGROUND

I.     **Fraudsters Purchase A Car, Westlake Purchases That Contract, And Attributes It To Plaintiff.**

A.     **Westlake Buys The Contract Despite Being On Notice That The Application Is Suspect.**

Westlake purchases vehicle-sale contracts from dealerships. (Plt.'s Stmt. of Uncontroverted Facts ("PSUF") ¶ 1.) A dealership presents a particular loan to five or six companies like Westlake, who then "fight over" who will purchase it. (*Id.* ¶ 2.) Fraudsters applied for financing to purchase a 2015 Ford Fusion using Plaintiff's maiden name and personal information, and were able to present a copy of Plaintiff's drivers license, yet the address on the application did not match the one on the license. (*Id.* ¶¶ 3–4.) Westlake did nothing to verify that the address, 6187 Atlantic Avenue, Apartment 210, Long Beach,

90805, was indeed an apartment complex. (*Id.* ¶ 5.) Westlake's Rule 30(b)(6) witness testified cost was the reason this was not done. (*Id.* ¶ 6.) The application was signed electronically in the name of "Melissa Hamilton," Plaintiff's maiden name. (*Id.* ¶7.) Plaintiff did not sign the contract or authorize anyone to sign on her behalf. (*Id.* ¶ 8.)

The application to the dealership also included, among other things, a list of individuals as references, which Westlake did not verify because the credit score Westlake obtained about Plaintiff was sufficiently high to waive the ordinary requirement of ten references. (*Id.* ¶ 9.) In its evaluation of whether it would purchase the contract from the dealer, Westlake also noted that the applicant had two outstanding vehicle loans, and its underwriting criteria required that the applicant "[p]rovide proof that all open auto loans have been paid off, traded-in, or are being paid by someone else." (*Id.* ¶ 10.) Westlake does not know whether that requirement was met or disregarded as to this transaction, yet Westlake purchased the contract anyway. (*Id.* ¶ 11.)

Westlake also obtained a credit report from Experian purporting to be about Plaintiff. (*Id.* ¶ 12.) That report contained as the same address as the application: 6817 Atlantic Avenue, Long Beach, which Westlake understood to be the applicant's home address. (*Id.* ¶ 13.) That report also contained several entries under a heading "Fraud Shield Summary," including that Plaintiff's Social Security Number had been used 12 times in the three months preceding the credit application at issue, and several relating to the applicant's address, such as "current address conflict," "current address not on file," "inquiry address: alert," and "on-file address: non-residential." (*Id.* ¶ 14.) Westlake has no idea what any of these entries mean. (*Id.* ¶ 15.) Despite these multiple alerts and irreconcilable information, Westlake went ahead with the contract purchase.

## B.    Plaintiff Had No Connection To The Vehicle Purchase Or Westlake.

Westlake has not produced any documents or other information even suggesting Plaintiff applied for or agreed to the contract Westlake purchased and attributed to her. Plaintiff did not purchase the vehicle at issue, did not direct anyone to do so, and did not

provide her personal information to anyone so that they could purchase a vehicle. (*Id.* ¶ 16.) She has never owned a Ford Fusion, the vehicle at issue, and did not electronically sign the credit application. (*Id.* ¶ 17.) Westlake produced checking account statements apparently part of the application process, and Plaintiff denied ownership of that account or having even heard of the bank. (*Id.* ¶ 18.) Plaintiff denied ever living in Long Beach, the city the fraudsters listed on the credit application, or at the specific address—on Atlantic Avenue—the fraudsters used, and none of her email addresses match the one on the application. (*Id.* ¶ 19.) She also testified that she never received any correspondence— no welcome letter, no delinquency notices—from Westlake, and had never heard of Westlake before this lawsuit. (*Id.* ¶ 20.) Plaintiff never made any payments on the account. (*Id.* ¶ 21.)

## II.      Plaintiff Disputes The Westlake Account As The Result Of Identity Theft.

Plaintiff learned her identity had been stolen in the Fall of 2019. (*Id.* ¶ 22.) Upon reviewing her credit reports, she learned of the Westlake account being attributed to her. (*Id.* ¶ 23.) Westlake reported to the credit bureaus that the account belonged to Plaintiff and had a delinquent payment history, which Westlake knows will negatively impact a consumer's credit score. (*Id.* ¶ 24.) Westlake also later reported the account as a charge-off. (*Id.* ¶ 25.)

Plaintiff spoke to Westlake on the phone at least twice, explaining the account did not belong to her and was the result of identity theft. (*Id.* ¶ 26.) Plaintiff also filed three reports with the Huntington Beach Police Department, one with the Federal Trade Commission, and sent an identity theft affidavit to Westlake by mail. (*Id.* ¶ 27.) A detective from the Huntington Beach Police Department even called Westlake and explained that Plaintiff was the victim of identity theft and that Westlake should mark the account as fraudulent. (*Id.* ¶ 28.)

When none of this was successful in convincing Westlake to remove the inaccurate credit reporting, Plaintiff disputed with the Big-3 credit reporting agencies ("CRAs"),

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

Equifax, Experian, and TransUnion. Westlake produced multiple letters that the CRAs forwarded to it setting out, in detail, Plaintiff's disputes. (*Id.* ¶ 29.) Each letter plainly states that Plaintiff did not open the account Westlake was attributing to her, and later letters informed Westlake of the three reports she filed with the Huntington Beach Police Department, the report identification numbers, and the identification number of the report she filed with the F.T.C. (*Id.* ¶ 30.) The letters further contain copies of Plaintiff's Social Security Card, drivers license, and a letter confirming her mailing address, as well as statements of additional identifying information. (*Id.* ¶ 31.) In a later letter, Plaintiff included not only the numbers of the Huntington Beach police and F.T.C. reports, but also the cover page of the police reports, and the name and phone number of the Huntington Beach police officer to whom Westlake could speak about the reports. (*Id.* ¶ 32.)

**III.     Westlake Does Virtually Nothing To Investigate Plaintiff's Disputes.**

That Westlake is able to produce the dispute letters Plaintiff sent to the CRAs confirms that the CRAs forwarded Plaintiff's disputes to Westlake. (*Id.* ¶ 33.) Westlake receives those disputes in communications called ACDVs, which are transmitted to Westlake through an electronic system called e-OSCAR. (*Id.* ¶ 34.) Westlake's dispute investigators use a computer system called Sonnet to view ACDVs and process disputes. (*Id.* ¶ 35.)

Westlake keeps detailed notes on accounts, and those notes contain, among other things, all communications between Westlake and its consumer accountholders. (*Id.* ¶ 36.) In the notes connected to the account Westlake attributes to Plaintiff, for example, there are notations for the calls in which Plaintiff informed Westlake that she claimed the account resulted from identity theft, and from the Huntington Beach Police Department. (*Id.* ¶ 37.)

Westlake's dispute investigators do precious little in actually investigating disputes like those Plaintiff submitted. Jose Mata, one of the individuals who investigated Plaintiff's disputes, stated that he simply compares the identifying information in the

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

ACDV—name, date of birth, Social Security Number, address, and account status—with the information in those same categories in Westlake's records. (*Id.* ¶ 38.) The ACDVs Westlake received relative to Plaintiff's disputes all included as attachments the dispute letters Plaintiff sent the CRAs. (*Id.* ¶ 39.) When presented with letters like the ones Plaintiff wrote to the CRAs, all Westlake's dispute investigators do is review the letter to determine if it is an identity theft affidavit. If it is not, the investigators pay no attention to the substance of the letter or whether any of the information in it would be useful in their investigations. (*Id.* ¶ 40.) Westlake's Rule 30(b)(6) witness confirmed that Mr. Mata's handling of Plaintiff's disputes from all three CRAs would have followed this formula. (*Id.* ¶ 41.) So when a consumer like Plaintiff writes a detailed letter outlining the nature of the dispute, and including information like the numbers of police reports and F.T.C. reports, drivers licenses, and other information directly relevant to the dispute and Westlake's investigations, Westlake's investigators wholly, and as a matter of ordinary procedure, disregard it without any meaningful review.

ACDVs include dispute codes, which signal to the recipient of the ACDV what the CRA interprets to be the substance of the dispute. Several of Plaintiff's disputes were coded "103: claims true identity fraud/account fraudulently opened." (*Id.* ¶ 42.) Jose Mata testified that for disputes like Plaintiff's he simply compares information as described above, and disregards the substance of dispute letters if they are not identity-theft affidavits. (*Id.* ¶ 43.) Karen Campos, another of Westlake's dispute investigators who handled Plaintiff's disputes, testified similarly. (*Id.* ¶ 44.)

Westlake applies a remarkable process to certain disputes claiming identity theft. If Westlake concludes that a consumer's dispute of identity theft has the "correct information" that it might prove valid, Westlake's dispute investigators escalate that dispute to Westlake's legal department. (*Id.* ¶ 45.) The "correct information" in this context is an identity-theft affidavit or a police report. (*Id.* ¶ 46.) Nothing the consumer may say in his or her dispute letter makes any difference. (*Id.* ¶ 47.)

Once that escalation occurs, the FCRA dispute-investigation department plays no role. (*Id.* ¶ 48.) Even though the investigator escalates the identity-theft dispute as potentially valid, he or she still responds back to the CRAs that Westlake has verified as accurate the reporting of the account as belonging to the disputing consumer. (*Id.* ¶ 49.)

Once the dispute is escalated, Westlake's legal department then sends the consumer a letter, explaining that Westlake's desire to further investigate the claim of identity theft, and asking the consumer to provide certain, additional information. (*Id.* ¶ 50.) Westlake produced such a letter addressed to Plaintiff, but could not verify the letter was ever sent. (*Id.* ¶ 51.) The letter is dated April 13, 2020, which (if validly dated) places the letter as potentially being sent to Plaintiff nearly three months after her January 2020 dispute. (*Id.* ¶ 52.) Westlake's explanation for the passage of such a long period of time is that disputes are not escalated daily—all escalated disputes are sent to the legal department once a month. (*Id.* ¶ 53.)

These disputes then go into a letter-sending queue, Westlake's computer system generates the letters, and a third party prints and mails them. (*Id.* ¶ 54.) So by the time Westlake even gets around to generating this letter and claiming to take Plaintiff's dispute of identity theft seriously: (1) Plaintiff has spoken to Westlake twice on the telephone, both of which calls Westlake recorded, and told Westlake the account was the result of identity theft; (2) the Huntington Beach Police Department has called Westlake, which again was recorded, and told Westlake to mark the account as fraudulent; (3) Plaintiff has disputed at least twice through the CRAs stating that the account was the result of identity theft; and (4) Westlake repeatedly verified the disputed account as accurately attributed to Plaintiff and continued to report it as such to the CRAs. (*Id.* ¶ 55.) Despite having reason to believe that there may indeed be some heft to Plaintiff's claims of identity theft such that its legal department needed to conduct a further investigation, each time Westlake verified the disputed information as accurate and corrected none if its reporting with the CRAs.

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

Of further note is how limited Westlake's dispute investigators are in what they are permitted to do as part of an investigation. They cannot review prior disputes. (*Id.* ¶ 56.) They do not call or email the disputing consumer or, as in this case, the police or F.T.C. (*Id.* ¶ 57.) They do not review the account notes as a matter of practice, so they would not see the discussions Plaintiff had with Westlake claiming the account was the result of identity theft, or the call from the Huntington Beach Police Department. (*Id.* ¶ 58.) They do not obtain separate reports about the disputing consumer, like a skip-trace or LexisNexis report, or other means to verify pertinent information. (*Id.* ¶ 59.) They do not use the internet to do any research relating to the dispute, such as the consumer or his or her address. (*Id.* ¶ 60.) They do not research the dealer from whom the contract originated. (*Id.* ¶ 61.) They do not contact anyone else at Westlake about the dispute. (*Id.* ¶ 62.)

Westlake's Rule 30(b)(6) witness testified that Westlake's dispute investigators followed Westlake's procedures for processing Plaintiff's disputes, and no mistakes were made regarding the investigation of Plaintiff's disputes. (*Id.* ¶ 63.)

**IV.    Westlake Never Appends Compliance Condition Codes To Dispute Results.**

e-OSCAR permits furnishers to include with ACDV responses notations of compliance condition codes, which the Consumer Data Industry Association's ("CDIA") Credit Reporting Resource Guide advises "[a]llows the reporting of a condition that is required for legal compliance." (*Id.* ¶ 64.) The Guide goes on to note that "[t]his condition may refer to accounts closed at consumer's request, accounts in dispute under the Fair Credit Reporting Act (FCRA), the Fair Debt Collection Practices Act (FDCPA) or the Fair Credit Billing Act (FCBA)." (*Id.* ¶ 65.) The Guide identifies several such codes pertinent here:

> **XB**    Account information has been disputed by the consumer directly to the data furnisher under the Fair Credit Reporting Act (FCRA); the data furnisher is conducting its investigation.
> *Definition: Reported when the completeness or accuracy of the account information is disputed directly to the data furnisher by the consumer under the FCRA and investigation of the dispute is in progress by the data furnisher.*

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

**XC**   FCRA direct dispute investigation completed — consumer disagrees with the results of the data furnisher's investigation.
*Definition: Reported when the investigation of an FCRA dispute made by the consumer directly to the data furnisher has been completed by the data furnisher; however, the consumer disagrees with the outcome of the investigation.*

**XH**   Account previously in dispute; the data furnisher has completed its investigation. (To be used for direct disputes under the FCRA, FDCPA disputes or FCBA disputes)
*Definition: Reported when the investigation of a dispute by the data furnisher was completed.*

(*Id.* ¶ 66.) Westlake never uses compliance condition codes when communicating dispute results to the CRAs. (*Id.* ¶ 67.) Westlake does not even know that compliance condition codes are. (*Id.* ¶ 68.) Although at least XC was certainly applicable, Westlake used none of these codes in responding to the CRAs for Plaintiff's disputes. (*Id.* ¶ 69.)

**V.   Westlake Undertrains And Overworks Its Dispute Investigators.**

Westlake's dispute investigators undergo online training provided by the CDIA every two years, and the training lasts four hours. (*Id.* ¶ 70.) There is no other training regarding the FCRA or dispute investigation given to these individuals. (*Id.* ¶ 71.) Trainees are tested at the end of the CDIA training, and receive a pass/fail grade. (*Id.* ¶ 72.) If an individual fails, they continue to work at Westlake as a dispute investigator and may retake the training, and Westlake does not have a limit on the number of times an individual can fail and continue to work. (*Id.* ¶ 73.)

Jose Mata testified that his best estimate of his pace investigating disputes is 10 per hour. (*Id.* ¶ 74.) That means he averages six minutes per dispute. Westlake's Rule 30(b)(6) witness stated that he did not speak to Mr. Mata about the disputes at issue in this case to prepare to testify "between that time and now, he's handled probably 25,000 disputes, if not more, and he is not going to recall what specifically he did on this one account back in 2020." (*Id.* ¶ 75.)

**VI.   Westlake Knows Nothing Of Court Decisions Pertinent To FCRA Compliance.**

Westlake does not know of any court decisions that are considered in drafting its dispute-investigation procedures. (*Id.* ¶ 76.) All its Rule 30(b)(6) witness, who is also the

Memo In Support Partial Summary Judgment

head of FCRA compliance, mentioned Westlake considers is the Credit Reporting Resource Guide and the FCRA. (*Id.* ¶ 77.) Westlake has never heard of the seminal decision regarding willful noncompliance with the FCRA, *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007), and therefore does not know if that decision played any role in creating its FCRA-compliance procedures. (*Id.* ¶ 78.)

## LEGAL FRAMEWORK

### I.   Summary Judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Under this well-settled standard, the moving party initially bears the burden of establishing a lack of true dispute of any material fact. *Herrera v. First Nat'l Bank of Omaha, N.A.*, No. CV17-1136 RSWL (SKAx), 2017 WL 6001718, at \*2 (C.D. Cal. Dec. 4, 2017). The burden then shifts to the non-party to show, through admissible evidence, that there is such a dispute of triable fact. *Id.* To avoid summary judgment, the non-movant must show more than just a dispute of *some* fact—it must show there is *genuine* dispute of *material* fact. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

"Federal Rule of Civil Procedure 56(g) authorizes courts to grant partial summary judgment to limit the issues to be tried in a case." *Herrera*, 2017 WL 6001718, at \*2. As such, Plaintiff requests the alternative relief of Partial Summary Judgment should the Court deny any aspect of her Motion.

### II.   The Fair Credit Reporting Act Provisions At Issue.

Plaintiff asserts a claim against Westlake for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b). To assert a prima facie violation, the plaintiff must "prove (1) Defendant is a 'furnisher'; (2) Plaintiff notified the [CRA] that Plaintiff disputed the reporting as inaccurate; (3) the [CRA] notified the furnisher of the alleged

inaccurate information of the dispute; (4) the reporting was in fact inaccurate; and, (5) Defendant failed to conduct the investigation required by § 1681s-2(b)(1)." *Robbins v. CitiMortgage, Inc.*, No. 16-cv-04732-LHK, 2017 WL 6513662, at \*5 (N.D. Cal. Dec. 20, 2017).

**III.    The Pertinent California Consumer Credit Reporting Agencies Act Provisions.**

The CCRAA is virtually identical to its federal counterpart, the FCRA. *See Carvalho*, 629 F.3d at 890. However, "[u]nlike the [FCRA], the [CCRAA] does not require that an agency notify the furnisher about disputed reports before a consumer gains a private right of action." *Robbins*, 2017 WL 6513662, at \*14.

Thus, to prevail on a CCRAA claim, the plaintiff "must prove that (1) Defendant is a 'person' under the CCCRAA, (2) Defendant reported information to a [CRA]; (3) the information reported was inaccurate; (4) Plaintiff was harmed; and, (5) Defendant knew or should have known that the information was inaccurate." *Id*.

ARGUMENT AND AUTHORITIES

**I.    Plaintiff Is Entitled To Judgment As A Matter Of Law On Her FCRA Claim.**

**A.    Plaintiff Establishes All Preliminary Elements Of Her Section 1681s-2(b) Claim.**

**1.    Westlake inaccurately reported the account as belonging to Plaintiff.**

"FCRA plaintiffs must prove that the furnisher reported inaccurate information to prevail on a § 1681s-2(b) claim." *Robbins*, 2017 WL 6513662, at \*6 (citing *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010); *Biggs v. Experian Information Solutions, Inc.*, 209 F Supp. 3d at 1144; and *Gorman*, 584 F.3d at 1163–64). "An item on a credit report can be inaccurate 'because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" *Id*. And as has been frequently stated, "[i]t is not seriously debated, however, that factually incorrect information is 'inaccurate' for purposes of FCRA." *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014).

Westlake reported the account on Plaintiff's credit as delinquent and, eventually, a charge-off. (PSUF ¶¶ 24–25.) Westlake understood that reporting to have a negative impact on Plaintiff's credit score. (*Id.*) There is no question in this case that Westlake's reporting was not accurate. It is a simple enough question: did Ms. Miller apply for and agree to purchase the vehicle on credit? No, she did not. She never applied for the vehicle loan and did not authorize anyone else to act on her behalf. Westlake has produced no application or document signed by or attributable to Plaintiff. Indeed, no one from Westlake was present when the application was completed, so it likewise cannot produce a witness stating that Ms. Miller executed the agreement. The documents and telephone recordings produced in this case by Westlake reveal a loan application and circumstances that would have put a reasonable lender on notice of the fraud. It is factually impossible for Ms. Miller to have been obligated, delinquent, or in default on an account that she never had, and Westlake cannot possibly dispute that.

Ms. Miller's affidavit, phone calls, police and F.T.C. reports, as well as her deposition testimony indisputably establish that she did not apply for or use Westlake's account. Westlake has no evidence to rebut those facts. An individual opened the account and included on the application an address that was different from Plaintiff's drivers license, and was signaled to Westlake as being potentially fraudulent by Experian. (*Id.* ¶¶ 4, 13–14.) Westlake did nothing with this information.

Beyond those listed items, Westlake has no other basis on which to defend the accuracy of its reporting. Even though this is not an action to enforce a contractual obligation, it is relevant and useful to analyze whether Westlake could have proved that the account belonged to Plaintiff under basic contract principles applicable to consumer-credit accounts. The analysis leads to one conclusion: Westlake could never prevail in an action to enforce upon Plaintiff a contractual obligation.

It is challenging to prove a negative: rebutting Westlake's implication that it was accurate to report that Ms. Miller was its account obligor. Westlake could pick anyone in

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

the country, report that they are obligated on its account and demand proof that this was not so. Obviously, it has to be Westlake's burden to show Plaintiff applied and agreed to be obligated on the account. Westlake will be unable to do that.

### 2.   Westlake is a data furnisher, and it furnished credit data about Plaintiff to the credit bureaus.

Pursuant to the FCRA, the term "furnisher" is used to describe those entities who provide credit information to consumer reporting agencies in the ordinary course of business. *See* 15 U.S.C. § 1681s-2; *Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 978 (N.D. Cal. 2014).

Here, Westlake admits, as it must, that it provided information about the account to the credit bureaus. (PSUF ¶¶ 24–25.) It also admitted as much in its Answer. (ECF 21 ¶ 10.) Westlake is therefore a furnisher, and furnished information about the account belonging to Plaintiff to the CRAs.

### 3.   Plaintiff disputed the Westlake account with the CRAs, who transmitted the disputes to Westlake, and Westlake verified the account as belonging to Plaintiff each time.

Furnishers' investigative duties are triggered when a consumer disputes the information being reported and the dispute comes to the furnisher via one of the CRAs. *Langan*, 69 F. Supp. 3d at 978. After furnishers receive notice of a dispute, they must conduct an investigation and verify the accuracy of the disputed information. *See* 15 U.S.C. § 1681s-2; *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004). Here, these things indisputably occurred.

Plaintiff disputed the reporting of the account, writing multiple letters to the CRAs. (PSUF ¶¶ 29–33.) Westlake admits to receiving those disputes from the CRAs, in the form of ACDVs. (*Id.* ¶ 80.)

For each dispute, Westlake verified the account as belonging to Plaintiff. (*Id.* ¶ 81.) These elements are therefore established.

**B.    Westlake's Investigations Of Plaintiff's Disputes Were Unreasonable.**

**1.    The FCRA demands a thorough, searching dispute investigation.**

15 U.S.C. § 1681s-2(b)(1) sets out the parameters for a furnisher's duties after it receives notice of a dispute:

> [T]he furnisher shall (A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by the [CRA]; (C) report the results of the investigation to the [CRA]; (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information…and (E) if an item of information disputed by the consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (i) modify . . . (ii) delete . . . or (iii) permanently block the reporting of that item of information [to the CRAs].

*Robbins*, 2017 WL 6513662, at *5. The touchstone of such investigations is reasonableness. *Prosser v. Navient Sols., Inc.*, No. 15-cv-01036-SC, 2015 WL 5168635, at *6–7 (N.D. Cal. Sept. 3, 2015) (citing *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d at 1162 (9th Cir. 2009) and *Drew v. Equifax Info. Servs.*, 690 F.3d 1100, 1110 (9th Cir. 2012)). In this context, "the term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citing *Johnson*, 357 F.3d at 430, which in turn quotes *Am. Heritage Dictionary* 920 (4th ed. 2000) and *Webster's Third New Int'l Dictionary* 1189 (1981)). Such an investigation cannot be slipshod but, instead, "requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute.'" *Soria v. U.S. Bank N.A.*, No. SACV17-603 CJC (KESx), 2019 WL 8167925, at *8 (C.D. Cal. Apr. 25, 2019). "A furnisher cannot escape its obligations 'by merely rubber stamping,' particularly 'where the circumstances demand[] a more thorough inquiry.'" *Id.*

**2.    Data matching under facts like these is *per se* unreasonable.**

**a.    The prevailing decisions find data conformity lacking.**

It is by now settled that "when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s-2(b) requires the

furnisher to seek out and obtain such evidence before reporting the information as 'verified.'" *Hinkle*, 827 F.3d at 1303; *see also Robbins*, 2017 WL 6513662, at *10 ("A furnisher's failure to consult sources beyond its internal records during an investigation can render the investigation unreasonable."); *Dennis v. BEH-1, LLC*, 520 F.2d 1066, 1070 (9th Cir. 2008) (same); *Johnson*, 357 F.3d at 431 (holding a jury could find that a furnisher's failure to look beyond internal information constituted an unreasonable investigation).

A furnisher's failure to examine information beyond its internal documents is a telltale sign that the investigation was unreasonable. *Gorman*, 584 F.3d at 1160–61; *Johnson*, 357 F.3d at 431. That is particularly true where, like here, the consumer disputes the account as resulting from identity theft. As Westlake's Rule 30(b)(6) witness agreed, "the idea behind identity theft is information is used to open an account that doesn't belong . . . to the fraudster." (PSUF ¶ 82.) "[T]he question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1312 (11th Cir. 2018). This is because the FCRA was enacted to preclude furnishers from "rubber stamping their earlier submissions, where circumstances demanded a more thorough inquiry." *Thomasian v. Wells Fargo Bank, N.A.*, No. 03:12-cv-01435-HU, 2014 WL 1244892, at *13 (D. Or. Mar. 25, 2014).

The Eleventh Circuit recently affirmed that a furnisher "obviously" failed to conduct a reasonable investigation as a matter of law by solely engaging in data conformity. *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1301 (11th Cir. 2019). Such a system unfairly produces the inescapable and "quite predictable" outcome of the investigation in that the employee would incorrectly verify the reported information. *Id*. at 1303.

Stated differently, the problem with data matching in circumstances like these is that it limits the "investigation" to merely comparing the information as reported by the

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

CRAs to its source within the furnisher's records. Here that is just what Westlake did—compare the name, date of birth, Social Security Number, and address in the ACDVs to that already in Westlake's system (and which Westlake was already reporting to the CRAs). (PSUF ¶¶ 38, 43–44.) Of course that information matched—that is how identity theft works. That information further matches because it is what Westlake is already reporting. Such a system is "reprehensible" and far short of what is required. *See Brim v. Midland Credit Mgmt., Inc.*, 795 F. Supp. 2d 1255, 1263 (N.D. Ala. 2011) (upholding punitive-damage award for consumer where trial evidence showed "defendant receives about 8,000 disputes per week and for 95% of those disputes, defendant checks its own records as a means of validating the debt"); *see also Daugherty v. Ocwen Loan Servicing, L.L.C.*, 701 F. App'x 246, 256–57 (4th Cir. 2017) (rejecting data conformity as a reasonable investigation); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611 (6th Cir. 2012) (reinstating consumer's claim for punitive damages when evidence showed that furnisher's data conformity "policy prohibited its employees from performing anything more than a cursory confirmation of its own records"). Westlake did nothing different from these many other defendants, making a conclusion that data-matching was an unreasonable investigation an easy one.

> **b.    All Westlake did was compare the identifying information in the ACDVs with its internal records, which is not enough when a consumer claims identity theft.**

Westlake's dispute investigations could not have been more cursory. All it did was match the name, date of birth, Social Security Number, and address submitted with the ACDVs—that stated the consumer "claims true identity fraud"—to what Westlake had in its records. (PSUF ¶¶ 38, 42–44.) That is all, and that is not hyperbole. Westlake's investigators simply scanned Plaintiff's dispute letters to determine if they were identity-theft affidavits, and they only did that because the program through which they process disputes requires that they click and view any attachments before the investigation may be completed. (*Id.* ¶ 47.) That process means ignoring Plaintiff's statements about three

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

police reports and the officers Westlake could contact to discuss the reports, her references to an F.T.C. report, and the other information underpinning her disputes. (*Id.* ¶¶ 30–32.) Since Westlake's investigators do not look at earlier ACDVs, they do not see any of the Plaintiff's dispute history, and because they do not review the account notes, they do not see or listen to the recordings of the two calls in which she stated the account was the result of identity theft or the call from the Huntington Beach Police Department stating the account was the result of fraud. (*Id.* ¶¶ 56, 58.) In short, Westlake's perfunctory investigation is designed to be hustled along, falling woefully short of "an inquiry likely to turn up information about the underlying facts and positions of the parties." *Soria*, 2019 WL 8167925, at *8.

Westlake's investigation process ignores the caution from *Johnson* against rubber stamping already-reported information, because it does "not look beyond the information contained in the [internal data file] and never consult[ed] underlying documents such as account applications." *Johnson*, 357 F.3d at 432. Westlake also never contacted Ms. Miller, the Huntington Beach Police Department, the F.T.C., not did it pull any other reports or information pertaining to Plaintiff or the application for credit. (PSUF ¶¶ 57, 59.) Any of this information would be pertinent and helpful to an investigation relating to a dispute of identity theft, yet Westlake looks the other way. Rather than permitting its investigators to even entertain the notion that the information in its system may itself be inaccurate, Westlake instead treats that information like infallible, gospel truth and simply parrots it back to the CRAs. The outcome of this system is "quite predictable"—Westlake incorrectly verified its reporting as accurate when it objectively was not. *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1303 (11th Cir. 2019).

Plaintiffs have sought the opinion of Evan Hendricks, a nationally respected expert on the credit-reporting industry, about Westlake's procedures. *See Brown v. Vivint Solar, Inc.*, No. 8:18-cv-2838-T-24 JSS, 2020 WL 1479079, at *5 (M.D. Fla. Mar. 26, 2020) (denying motion to exclude Hendricks' opinions, noting "Hendricks may testify regarding

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

the industry standards for preventing unauthorized access, whether Defendants' procedures complied with industry standards, and he can identify other measures that Defendants could have taken to" comply with the FCRA); *Ma v. Equifax Info. Servs., LLC*, 288 F. Supp. 3d 1360, 1366 (N.D. Ga. 2017) ("[T]he Court finds that Mr. Hendricks is qualified to testify regarding Defendant's procedures. He has written books and provided testimony before Congress and other governmental agencies relating to credit reporting agency practices."). He confirms that Westlake's data-matching process, coupled with the information Westlake had since the inception of the account and its willful ignorance of the information it later learned and Plaintiff presented in her disputes, resulted in inadequate investigations of Plaintiff's disputes. (PSUF ¶ 89.)

### c. Westlake unreasonably verified the reporting as accurate before sending Plaintiff's disputes to its legal department.

The most striking aspect of Westlake's dispute process is what it does when it escalates an identity-theft dispute to the legal department. In that instance, Westlake has decided that the consumer has provided sufficient information for Westlake to suspect that such a dispute deserves additional scrutiny. (PSUF ¶¶ 45–46.) Yet, despite its conclusion that more investigation is needed, Westlake still merely matches the data in its records and verifies the reporting as accurate to the CRAs. (*Id.* ¶¶ 43–44, 49.) Westlake took this exact tactic with Plaintiff's disputes. It is frankly difficult to imagine a more unreasonable course of conduct than deciding additional information and investigation is needed to evaluate a dispute, but still verifying to the CRAs that the disputed information is indeed accurate. The Court should conclude that this event, standing alone, violates Section 1681s-2(b) as a matter of law.

Here again, Mr. Hendricks confirms the inadequacy of such a process. He explains that Westlake's escalate-yet-verify-anyway process:

> [R]uns counter to practices designed to identify and delete inaccuracies, which counsel either pausing the dispute, seeking additional time to complete the investigation, deleting the tradeline as unverifiable or, even more simply,

hiring a larger staff so that such investigations can be adequately completed within the period set out in the FCRA.

(PSUF ¶ 41.) In other words, Westlake eschews industry standards and basic logic to give the impression that it is actually concerned with solving consumers' problems stemming from identity theft when, in truth, it makes them worse.

### d.      Westlake falsely reported to the CRAs that it verified the account as belonging to Plaintiff.

It is one thing for a furnisher to perform a perfunctory or negligent investigation. Westlake was required to act to a certain level and it acted below that. But a violation of § 1681s-2(b)(1)(C) is something more malevolent. Westlake did not merely fail to do the job the FCRA required of it, but it turned around in each of Plaintiff's disputes and falsely claimed that it had done more than it ever does. It told each of the CRAs that it had "verified" its reporting that Ms. Miller was the correct obligor on its account and that was "accurate as of the date reported," a result it reported despite believing that additional investigation by the legal department was needed. (PSUF ¶¶ 55, 81.) And it reported that without also stating to the CRAs that Plaintiff's disputes continued. (*Id.* ¶¶ 67–69.) These untruths were not merely negligent, as Westlake confirmed that Plaintiff's disputes were handled according to Westlake's procedures, and no mistakes were made. (*Id.* ¶ 63.)

As a matter of law Westlake violated § 1681s-2(b)(1)(C), which requires a furnisher to "report the results of the investigation to the consumer reporting agency." Summary judgment is appropriate where, as here, the defendant did not accurately report the account information it possessed after investigation or untruthfully reported what it did and found. *Hrebal v. Nationstar Mortg. LLC*, 385 F. Supp. 3d 849, 852–53 (D. Minn. 2019) (collecting cases granting consumers affirmative summary judgment on violation of § 1681s-2(b)(1)(C)); *see also Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 854–55 (E.D. Va. 2017) (granting summary judgment to consumer where furnisher did not accurately report the results of its investigations of disputes of identity theft).

Plaintiff expects Westlake will argue that while it may have been wrong in

attributing its account to Ms. Miller, there was enough doubt at the time that it was not unreasonable in suspecting this was accurate. As detailed above, however, there was no such association nor a basis to believe it. Still, regardless of the good faith of its suspicion, Westlake cannot possibly argue in good faith that it ever genuinely "verified" the correctness of its reporting. And yet that is what it told the CRAs. In each of the ACDV disputes at issue here, Westlake reported as its § 1681s-2(b)(1)(C) "results of investigation" that it had in fact "verified" Ms. Miller as the applicant and obligor. (PSUF ¶¶ 55, 81.) That was false reporting. Nothing about Westlake's investigations succeeded in "verifying" the obligation.

The most thorough discussion of this process was offered by the Eleventh Circuit in *Hinkle*. 827 F.3d at 1302. When a furnisher conducts an FCRA investigation, there are "three potential ending points" to such investigation: "[1] verification of accuracy, [2] a determination of inaccuracy or incompleteness, or [3] a determination that the information 'cannot be verified.'" *Id*. Here, as always apparently, Westlake reported to the CRAs that its investigation had resulted in number (1), that it had verified the accuracy of its reporting. However, as the Eleventh Circuit noted:

> [T]he ordinary meaning of "verification" is: (1) "evidence that establishes or confirms the accuracy or truth of something"; (2) "the process of research, examination, etc., required to prove or establish authenticity or validity"; (3) "a formal assertion of the truth of something, as by oath or affidavit"; and (4) "a short confirmatory affidavit at the end of a pleading or petition." *Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 782–83 (6th Cir. 2014) (quoting Random House Unabridged Dictionary 2113 (2d ed.1993)).
>
> "Verify" has a similar meaning in the legal context. *See* Black's Law Dictionary 1793 (10th ed. 2014) ("verify vb. (14c) 1. To prove to be true; to confirm or establish the truth or truthfulness of; to authenticate. 2. To confirm or substantiate by oath or affidavit; to swear to the truth of.").

*Hinkle*, 827 F.3d at 1303–04. When Westlake reported to the CRAs—repeatedly—that it had "verified" that Ms. Miller was the applicant and obligor on its account, it was reporting more than its belief on circumstantial evidence. Instead, as its § 1681s-2(b)(1)(C) response,

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

Westlake was reporting that its investigation had "prove[n] to be true" this assertion. And as a result, each CRA relied on and retained that inaccurate reporting.

As the Eleventh Circuit explained, the FCRA's "framework reflects the fact that § 1681s-2(b) is designed not only to exclude false information from credit reports, but also to prevent the reporting of unverifiable information. When a furnisher determines that disputed information is false or 'cannot be verified,' the furnisher must notify the CRAs of this result pursuant to § 1681s–2(b)(1)." *Id.* Given the lack of proof of the underlying obligation, the furnisher should have "at least informed the credit reporting agencies that [it] could not conclusively verify" the disputed information. *Johnson*, 357 F.3d at 432 (explaining that if a furnisher "at least informed the credit reporting agencies that [the furnisher] could not conclusively verify" that the consumer was the correct obligor, the CRA would have had to "promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation'"). Westlake did not take this vital step, violating the FCRA as a matter of law.

### C. Westlake Failed To Note An Appropriate Compliance Condition Code When It Communicated Its Dispute Results To The CRAs.

Consumer disputes are sent to furnishers such as Westlake through online ACDVs, and ACDVs have certain fields that transmit the substance and details of a furnisher's credit reporting on a specific account. One of those fields is the Compliance Condition Code or "CCC" field.  (PSUF ¶¶ 64–65.) That field is primarily used to transmit the status of a consumer's dispute related to an investigation. (*Id.* ¶¶ 64–66.) Westlake not only trains its dispute investigators not to use CCCs at all, Westlake does not even know what they mean. (*Id.* ¶¶ 67–68.) Westlake therefore sidesteps this additional, required method to properly inform the CRAs, and credit-report recipients, the true results of its supposed investigation and status of the account. In each instance, Plaintiff's account remained in dispute after Westlake's investigations, yet Westlake never used any CCC communicating that fact to

the CRAs. This leaves the impression that there is no dispute relating to the reporting of the account where in reality the opposite is true.

*Wood* places this problem in stark relief. There, despite multiple appropriate codes that could be applied, "[i]n almost all situations, Credit One's policies instruct an agent responding to an ACDV to update the CCC to XH—indicating that a previous dispute existed but is now resolved—once the agent has completed his or her investigation." *Wood*, 277 F. Supp. 3d at 837. That code—"XH"—means "Account previously in dispute—now resolved, reported by data furnisher." *Id.* at 836. The furnisher's use of "that code was materially misleading," and the same logic applies here because, like Mr. Wood, Plaintiff "continued to dispute that the Account was [hers], and [s]he continued to dispute the results of [the furnisher]'s investigations—as evidenced by the fact that [s]he continued to submit ACDVs." *Id.* at 855. While the furnisher in *Wood* violated the FCRA when it "created a materially misleading impression" that the account was not in dispute by reporting "a CCC of XH when [the consumer] was continuing to dispute the accuracy of [the furnisher]'s reporting," Westlake created the same misleading impression that Plaintiff did not dispute the account by failing to attach any CCC to its responses to the CRAs. *Id.* (citation omitted).

Westlake's violation of § 1681s-2(b)(1)(C) is obvious enough in that it even failed to report the account as "in dispute." Every Circuit to consider the question has so found. *Gorman*, 584 F.3d at 1162–63; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d at 149–50; *Seamans*, 744 F.3d at 867; *Boggio*, 696 F.3d at 618 (6th Cir. 2012). This Court should follow suit.

**D.    Plaintiff Suffered Actual Damages From Westlake's Conduct.**

Plaintiff testified that she suffered actual damages from Westlake's inaccurate reporting and failure to correct the errors in her reports. First, she plainly noted her ability to distinguish damages attributable to Westlake, noting she "felt hopeless with them," and that Westlake harassed her in trying to have her pay on the delinquent account. (PSUF ¶ 83.) She further noted the emotional distress this conduct caused. (*Id.* ¶ 84.) Westlake also

repeatedly called her, including at work, despite her instructions to stop, causing annoyance in addition to the emotional distress. (*Id.* ¶ 85.) The derogatory reporting embarrassed Plaintiff because she has always had "amazing credit," yet Westlake continued its inaccurate reporting in the face of her multiple, detailed disputes. (*Id.* ¶ 86.) She also cogently outlined other facets of her damages, including lost credit capacity, reduced credit limits, time lost due to disputing with Westlake, and anxiety when applying for credit. (*Id.* ¶ 87.) Any of these is sufficient to prove this element of her FCRA claim.

### E.      Westlake's Violations Of The FCRA Were Willful.

While not part of Plaintiff's prima facie case, she contends the Court should find as a matter of law that Westlake's violations of the FCRA were willful. "Willful violation of the FCRA enables a plaintiff to seek actual damages, punitive damages, and attorney's fees." *Lopez v. Experian Info. Sols., Inc.*, No. 19-cv-01954-RS, 2022 WL 1569285, at *7 (N.D. Cal. May 18, 2022). "A defendant willfully violates the FCRA when it acts in a manner 'known to violate' the FCRA or acts in 'reckless disregard of statutory duty.'" *Id.* (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)). The Circuit Courts agree that "although the [willful] act must be intentional, it need not be the product of 'malice or evil motive.'" *Reynolds v. Hartford Fin. Servs. Group, Inc.*, 435 F.3d 1081 (9th Cir. 2006) citing to *Dalton v. Capital Associated Indus.*, 257 F.3d 409, 418 (4th Cir. 2001) (holding that a plaintiff need not show malice or evil motive); *Cousin v. Trans Union Corp.*, 246 F.3d 359, 372 (5th Cir. 2001) (same); *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998); *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226 (3d Cir. 1997).

In *Marchisio*, the Eleventh Circuit recently noted engaging in mere data conformity constituted egregious conduct and was a willful violation of the FCRA. *Marchisio*, 919 F.3d at 1302–03. Similar holdings have been made at both the Circuit and District levels across the Country. Here, it is undisputed that Westlake did not conduct an investigation of any kind upon receipt of Plaintiff's disputes. Such a hands-off approach evidences Westlake's complete disregard for Plaintiff's rights. While the FCRA requires furnishers

to seek out information to establish the validity of their reporting, Westlake instead chooses to make it impossible for consumers to correct inaccurate tradelines through the FCRA process.

It is likewise objectively unreasonable to handle identity-theft disputes as Westlake does. Sending a dispute to the legal department *after* it has verified the reporting as accurate to the CRAs is the antithesis of what Section 1681s-2(b) demands. And Westlake's investigation results certainly do not "verify" anything—they merely confirm already-reported data remains and, perhaps, more investigation is needed. But the legal department can handle that.

Westlake acted in a manner that it knew violates the FCRA. The Act requires that Westlake perform a reasonable investigation of Plaintiff's disputes, and all Westlake did was match data and scan Plaintiff's letters to determine if they were affidavits or police reports. Despite engaging in no genuine investigation, Westlake falsely stated to the CRAs it had "verified" the reporting as accurate, even doing so when it had enough doubt in that conclusion that it enlisted its legal department to take a more thorough look. That this violates Section 1681s-2(b) is obvious on even the most-cursory read of the statute's demands. Westlake therefore acted willfully in its violations of the FCRA as to Plaintiff's disputes.

**II.    There Are No Disputes Of Material Fact As To Plaintiff's CCRAA Claim.**

The CCRAA is virtually identical to its federal counter part but, "[u]nlike the [FCRA], the [CCCRAA] does not require that an agency notify the furnisher about disputed reports before a consumer gains a private right of action." *Reagan v. Am. Home Mortg. Servicing Inc.*, No. C 11-00704 WHA, 2011 WL 2149100, at *3 (N.D. Cal. May 31, 2011). A claim under Section 1785.25(a) requires that Plaintiff show "(1) that Defendant is a "person" under the CCRAA, (2) that Defendant reported information to a CRA, (3) that the information reported was inaccurate, (4) that Plaintiff was harmed, and

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

(5) that Defendant knew or should have known the information was inaccurate." *Robbins*, 2017 WL 6513662, at *16.

The first four elements are discussed above as to the FCRA, and they are indisputably met and supported by record evidence. Thus, as that remains is for Plaintiff to show that Westlake knew or should have known its reporting was inaccurate.

The CCRAA, which almost mirrors the FCRA, states that "a person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." *See Carvalho*, 615 F.3d at 1227–28 (citing Cal. Civ. Code § 1785.25(a)).

As outlined above, Westlake ignored early signals of likely fraud in the application, Plaintiff submitted multiple disputes directly to Westlake, the police called Westlake to inform it that the account was resulted from fraud, and Plaintiff submitted multiple disputes through the CRAs. (PSUF ¶¶ 4, 5, 14, 26, 28–33.) Although Westlake eventually decided to cease the reporting of the account, it did not submit the form to accomplish that to the CRAs until April 29, 2021, two weeks after she filed this lawsuit. (*Id.* ¶ 88.) So while Westlake did eventually ask that the account be deleted from Plaintiff's reports, Westlake knew or should have known long before this deletion that the information being reported to the credit bureaus was inaccurate.

## CONCLUSION

Westlake will be unable to raise a triable issue of fact for any element of Plaintiff's claims. For the reasons set forth above, the Court should grant Plaintiff's Motion and set the case for trial on the limited issues of Plaintiff's actual damages and punitive damages to be assessed against Westlake.

July 15, 2022

Respectfully submitted,

**MELISSA MILLER,**

By: */s/ Craig C. Marchiando*
Craig C. Marchiando (SBN 283829)

Leonard A. Bennett (*pro hac vice*)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel.: (757) 930-3660
Fax: (757) 930-3662
craig@clalegal.com

Octavio Gomez (*pro hac vice*)
**THE CONSUMER LAWYERS**
412 E. Madison #903
Tampa, FL 33602
Phone: 813-299-8537
Mobile: 813 299 8537
Fax:    844-951-3933
Email:  Tav@TheConsumerLawyers.com

*Counsel for Plaintiff*

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT