Craig C. Marchiando (SBN 283829)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel: (757) 930-3660
Fax: (757) 930-3662
craig@clalegal.com

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### Southern Division

| | |
|---|---|
| **MELISSA MILLER,** ) | **Case No.: 8:21-CV-00692** |
| ) | |
| **Plaintiff,** ) | |
| ) | Honorable Josephine Staton |
| **v.** ) | |
| ) | **PLAINTIFF'S REPLY** |
| **WESTLAKE SERVICES, LLC d/b/a** ) | **MEMORANDUM IN SUPPORT** |
| **WESTLAKE FINANCIAL** ) | **OF MOTION FOR PARTIAL** |
| **SERVICES,** ) | **SUMMARY JUDGMENT** |
| ) | |
| **Defendant.** ) | **Hearing date:** Oct. 28, 2022 |
| _____ ) | **Time:** 10:30 a.m. |
| ) | **Location:** Courtroom 8A |

# TABLE OF CONTENTS

THE SIGNIFICANT PROCEDURAL PROBLEMS WITH WESTLAKE'S OPPOSITION BRIEFING………………………………………………………………………..1

WESTLAKE'S FACTUAL RECITATION RELIES LARGELY ON STATEMENTS THAT ARE UNSUPPORTED OR ARE CONTRADICTED BY SWORN TESTIMONY………………………………………………………………………..2

ARGUMENTS AND AUTHORITIES………………………………………………………5

   I.  Plaintiff Does Not Need To Prove She Is A Victim Of Identity Theft To Prevail………………………………………………………………........5

      A.    Plaintiff Has Proven That Westlake's Attributing Of The Account To Her Was Inaccurate As A Matter Of Law…………………………………...5

      B.    Westlake's Failure to Attach Compliance Condition Codes To The Account Resulted In Further Inaccurate Reporting………………………..9

   II. Plaintiff's Other FCRA Lawsuits Are Irrelevant To This One……………......11

      A.    That Plaintiff Suffered Damages Is An Element Of Her Claim…………..11

      B.    Any Recovery In A Different Lawsuit Would Not Reduce Plaintiff's Damages Here………………………………………………………..11

   III. Westlake Has Not Rebutted Plaintiff's Evidence That Its Investigations Were Unreasonable As A Matter Of Law……………………………….....................13

      A.    Westlake Does Not Address The Inherent Inconsistency Of Escalating A Dispute To Its Legal Department While Simultaneously Verifying To the CRAs That The Reporting Is Accurate………………………………..13

      B.    The Escalation Of Disputes Confirms A Section 1681s-2(b) Violation As A Matter Of Law. ……………………………………………………15

      C. Westlake May Not Turn Its Duty To Investigate Onto Consumers……..........16

D.    Westlake Has Not Rebutted Plaintiff's Evidence That All Westlake Did To Investigate Plaintiff's Disputes Was Review Its Own Account Records……………………………………………………………………18

IV. Westlake Did Not Counter Plaintiff's Evidence And Arguments That Westlake Acted Willfully………………………………………………………………….20

V. Plaintiff Is Entitled To Judgment As A Matter Of Law On Her CCRAA Claim.………………………………………………………………………….20

CONCLUSION……………………………………………………………….....21

# TABLE OF AUTHORITIES

## CASES

*Block v. City of Los Angeles,*

  253 F.3d 410, 419 n.2 (9th Cir. 2001) ........................................................................2

*Brim v. Midland Credit Mgmt., Inc.,*

  795 F. Supp. 2d 1255, 1266 (N.D. Ala. 2011) ....................................................12, 13

*Dalton v. Capital Associated Indus.,*

  257 F.3d 409, 415 (4th Cir. 2001) ...........................................................................10

*Dane v. U.S. Bank, N.A.,*

  No. 3:12-cv-00333-ST, 2013 WL 11319046, at *2 (D. Or. May 31, 2013) ..........11

*Fregoso v. Wells Fargo Dealer Servs., Inc.,*

  No. CV 11-10089-SJO, 2012 WL 4903291, at *4 (C.D. Cal. Oct. 16, 2012) .........6

*Gorman v. Wolpoff & Abramson, LLP,*

  584 F.3d at 1147, 1155-57, 1163 (9th Cir. 2009)..................................10, 13, 14, 16

*Hinkle v. Midland Credit Mgmt., Inc.,*

  827 F.3d 1295, 1306 (11th Cir. 2016).................................................................17, 18

*In re: Ameriquest Mortg. Co.,*

  No. 05-7097, 2008 WL 630883, at *3 (N.D. Ill. Mar 5, 2008) .............................13

*Irwin v. Mascott,*

  94 F. Supp. 2d 1052, 1058 (N.D. Cal. 2000) .........................................................13

*Jenkins v. Cap. One, N.A.,*

   No. 14-cv-5683-SJF, 2017 WL 1323812, at *7 (E.D.N.Y. Feb. 28, 2017) ............8

*Kay v. First Cont'l Trading, Inc.,*

   966 F. Supp. 753, 754-55 (N.D. Ill. 1997) ...........................................................13

*Kudlicki v. MDMA, Inc.,*

   No. 05-2589, 2006 WL 1308617, at *3 (N.D. Ill. May 10, 2006) ........................13

*Meyers v. Freedom Credit Union*,

   No. 05-3526, 2008 WL 630883, at *8 (E.D. Pa. Sept. 21, 2007) ........................13

*Morris v. Equifax Info. Serv., LLC,*

   No. 2:18-cv-1829-JAD, 2020 WL 1957550, at *8 (D. Nev. Apr. 23, 2020) .........11

*Nelson v. Equifax Info. Servs., LLC*,

   522 F. Supp. 2d 1222, 1239 (C.D. Cal. 2007) .....................................................12

*Perez v. ECFC Holdings, Inc.,*

   No. CV16-4000-DSF, 2016 WL 10988574, at *3 (C.D. Cal. Aug. 2, 2016) .........15

*Ponder v. Ocwen Loan Servicing, LLC,*

   No. 1:16-cv-04125-ELR, 2021 WL 5027495, at *9 (N.D. Ga. Aug. 4, 2021) ........4

*Rahi v. Specialized Loan Servicing, LLC,*

   No. 21-cv-02717-LB, 2022 WL 1409232, at *10 (N.D. Cal. May 4, 2022) ..........14

*Safeco Ins. Co. of Am. v. Burr*,

   551 U.S. 47 (2007)................................................................................................20

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

*Saunders v. Branch Banking & Trust Co. of Va.*,

    526 F.3d at 142, 150 (4th Cir. 2008) ........................................................................10

*Sloane v. Equifax Info. Servs.*,

    510 F.3d 495, 501 (4th Cir. 2007) ........................................................................12

*Vasquez-Estrada v. Collecto, Inc.*,

    No. 3:14-cv-01422-ST, 2015 WL 6163971, at *6 (D. Or. Oct. 20, 2015) .............10

*Wood v. Credit One Bank*,

    277 F. Supp. 3d 821, 850-51, 854–55 (E.D. Va. 2017).............................................6

*Woods v. LVNV Funding, LLC*,

    27 F.4th 544, 546-47, 550 (7th Cir. 2022) ...........................................17, 18, 19, 20

*Zook v. Equifax Info. Servs. LLC*,

    No. 3:17-cv-2003-YY, 2018 WL 10604347, at *2 (D. Or. July 7, 2018)..............12

**STATUTES**

California Consumer Credit Reporting Agencies Act,

    CAL. CIV. CODE §§1785.1-1785.36...................................................................20, 21

Fair Credit Reporting Act,

    15 U.S.C. § 1681s-2(b).................................................................................passim

**RULES**

FED. R. CIV. P. 26(b) ...................................................................................................12

Plaintiff Melissa Miller submits this Reply in support of her motion for partial summary judgment against Defendant Westlake. As Westlake has failed to effectively counter Plaintiff's undisputed facts and has submitted no undisputed facts of its own, everything falls in Plaintiff's favor. The Court should therefore grant Plaintiff's Motion.

## THE SIGNIFICANT PROCEDURAL PROBLEMS WITH WESTLAKE'S OPPOSITION BRIEFING

Plaintiff notes at the outset multiple problems with Westlake's briefing that hamper her ability to effectively respond. For instance, Westlake did not submit its own, separate statement of undisputed facts as required by the Court's Standing Order (ECF 10 § 9.c.i.), so Plaintiff is not aware of what Westlake facts it claims are undisputed in support of its opposition arguments. While Plaintiff responded to factual statements made in the Declaration of Tracy Bergiman (ECF 55-3), she submits that Westlake's failure to abide by the Court's Order means Westlake has no undisputed facts in support of its opposition.

Second, Westlake did not discuss its objections to Plaintiff's evidence in a separate, two-column document, again violating the Court's Standing Order. (*Id*. § 9.c.ii.) Plaintiff was therefore forced to construct her own document, input Westlake's objections, and then insert her responses. While Plaintiff did address Westlake's objections on the merits, she believes the Court should appropriately conclude that Westlake's objections are waived.

Next, Westlake has included with its briefing a Declaration and expert report from John Ulzheimer. Westlake did not, however, comply with the Scheduling Order and serve Mr. Ulzheimer's report on Plaintiff by the July 15, 2022 deadline. (ECF 24 at 2.) This filing is therefore the first time Plaintiff has seen this report, nearly 90 days after the deadline to serve it. Plaintiff is also unable to effectively respond to this report with the opinions of her expert, because she did not possess it in time to meet the August 12, 2022 deadline to serve rebuttal expert reports. (*Id.*) Because no timely report was served, Plaintiff had no reason to seek the deposition of Mr. Ulzheimer by the September 9, 2022 expert discovery cutoff. (*Id.*) Even more egregiously, Mr. Ulzheimer offers multiple

rebuttal opinions to those of Plaintiff's timely-disclosed expert, Evan Hendricks. (ECF 55-1 at 16–19, 21.) Westlake's woefully late disclosure of Mr. Ulzheimer's Report robbed Plaintiff of her opportunity to respond to Mr. Ulzheimer's opinions. This tactic is opposition by ambush, plain and simple. And the Court should not permit it.

Finally, Westlake filed a host of documents that include Plaintiff's and other consumers' personal identifying information, *including full names, dates of birth and full Social Security Numbers*, in violation of Federal Rule of Civil Procedure 5.2. (*See* ECFs 55-2; 55-3 (Westlake's Exs. J; S; EE; GG; HH; JJ; PP; QQ; SS; and, TT).) This significant error went unnoticed by Westlake, with Plaintiff bringing it to Westlake's attention on October 12. Westlake contacted the Clerk's office for guidance, but as of the date of this filing, the error has not been corrected. Thus, the Court should require that Westlake file properly redacted documents, and further, should impose sanctions for such a blatant violation of a common-sense rule.

On the whole, the Court should treat Westlake's filings with heightened scrutiny. Plaintiff addresses more fully below additional infirmities with Westlake's evidence and statements it makes, but Westlake deserves no benefit of the doubt on anything it has presented.

### WESTLAKE'S FACTUAL RECITATION RELIES LARGELY ON STATEMENTS THAT ARE UNSUPPORTED OR ARE CONTRADICTED BY SWORN TESTIMONY

Westlake has used the time between Plaintiff's filing of her Motion and its opposition to attempt to rewrite nearly the entire record in this case. With the Declaration of Tracy Bergiman, who also served as Westlake's Rule 30(b)(6) witness, Westlake makes multiple statements that cannot be reconciled with Bergiman's deposition testimony or that of Westlake's other witnesses, and certainly cannot be used to create fact issues on summary judgment. *Block v. City of Los Angeles*, 253 F.3d 410, 419 n.2 (9th Cir. 2001) ("A party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts."). Apart from crafting a new record, Westlake

includes in its brief a host of statements that are not supported by evidence or the evidence to which Westlake points does not support the proposition Westlake offers.

Westlake's liberties with the record begin with its first points discussing the evidence. Westlake notes, for example, that "[i]t has not been conclusively established if MILLER or someone else made the purchase [of the vehicle underlying the account Westlake attributed to Plaintiff]." (ECF 55 at 8.) Wrong. Plaintiff testified at her deposition and in a sworn declaration in support of her Motion that she did not purchase the vehicle. (ECF 52 ¶¶ 16–17.) Westlake also states that the fraudsters produced to the dealer Plaintiff's "actual driver's license," but that too is incorrect. (ECF 55 at 8.) All Westlake knows is that there is a photocopy of a driver's license, which has an address that does not belong to Plaintiff. Westlake's Rule 30(b)(6) witness testified that Westlake does not know if the actual license was ever provided to the dealer. (Plt.'s Reply Stmt. of Uncontroverted Facts ("PRSUF") ¶ 91.)

Westlake also discusses employment-related documentation that the dealer obtained, stating that regarding a form indicating her employer and status, "MILLER has testified that the information was correct, including her rate of pay." (ECF 55 at 8.) Westlake wildly misreads Miller's deposition testimony for this statement, because she testified that the rate of pay on the form was wrong—she was paid less. (PRSUF ¶ 92.)

Westlake next emphasizes that a payment was made on the account, by someone named Andrew Chavez, and that Plaintiff's "name is listed in the notes as being on the credit card payment." (ECF 55 at 9.) According to Westlake, this "entry is critical in evaluating the reasonableness of WESTLAKE's investigation into MILLER's claim of identity theft." (*Id*.) Westlake of course does not mention that Plaintiff testified she does not know Andrew Chavez, does not have a VISA card ending in the four digits in Westlake's account notes, and did not make any payments on the account. (PRSUF ¶¶ 93–95.) For Westlake's argument that this event was supposedly "critical" in its investigation of Plaintiff's disputes, it later notes that "WESTLAKE verified that Plaintiff's Driver's

License and Social Security number matched and that the sole payment on the account was from Plaintiff's place of business." (ECF 55 at 13, 14.) Yet, the deposition excerpt and documents to which Westlake directs the Court do not mention anything about anyone at Westlake verifying her drivers license number or anything relating to this payment as part of a dispute investigation. (*See* ECF 55-3, Ex. RR ("Q. Okay. And we talked about that a minute ago. They compared the data that was in Westlake's records with the data that was on the dispute letter; right? Name, address, Social, that sort of thing; right? A. Correct."); *id.*, Exs. HH, II (showing nothing of what occurred in dispute investigations).)

Westlake next discusses its "investigation," without really stating to which of Plaintiff's disputes this explanation applies. (ECF 55 at 13.) That failure to distinguish is meaningful, as each of Plaintiff's FCRA-governed disputes raises a potential separate claim for Westlake's failure to reasonably investigate. *Ponder v. Ocwen Loan Servicing, LLC*, No. 1:16-cv-04125-ELR, 2021 WL 5027495, at *9 (N.D. Ga. Aug. 4, 2021) (noting "each failure to adequately investigate a dispute sets forth a new violation"). Westlake provides little in the way of substance regarding its purported investigation. For example, Westlake states that it "verified that Plaintiff's Driver's License and Social Security number matched and that the sole payment on the account was from Plaintiff's place of business" (ECF 55 at 13) but, as explained just above, that is not what the deposition testimony Westlake cites for this premise says. (*See* ECF 55-3, Ex. RR.) Westlake repeats this same refrain on the following page, but again as noted above, cites to only documents which do not show what anyone actually did as part of the investigation. (*See id.* Exs. HH, II.) Westlake claims to have mailed Plaintiff a letter asking her for additional information as part of its investigation. (ECF 55 at 13.) As discussed fully below, that is not enough to qualify as a compliant Section 1681s-2(b) investigation.

Westlake discusses what two of its dispute investigators supposedly did with Plaintiff's disputes, but badly mischaracterizes these individuals' testimony. Westlake states "Mr. Mata and Ms. Campos testified by way of deposition that they looked at the

substance of the consumer letter." (ECF 55 at 14.) Mr. Mata, however, testified to the exact opposite:

> **Q** You're clicking on those images and just looking for an affidavit, right?
>
> **A** Yes.
>
> **Q** Okay. If there's not an affidavit, is your investigation complete?
>
> **A** Yes.
>
> **Q** And you don't look at the substance of any of the letters to see what the consumers actually said, right?
>
> **A** No.

(ECF 55-2, Ex. L at 109:7–16.) Ms. Campos did not fare much better, testifying just that she "scanned" the letter rather than reading the entire thing. (ECF 55-2, Ex. M.) Westlake completes its discussion of the investigation process by addressing the "the post dispute investigation" (ECF 55 at 14–15), apparently hoping to convince the Court that what it does after it verifies to the CRAs information it has not confirmed is accurate has any meaning. Under Section 1681s-2(b), what Westlake does after it submits an ACDV with the results of its investigation has no meaning at all.

### ARGUMENT AND AUTHORITIES

**I.    Plaintiff Does Not Need To Prove She Is A Victim Of Identity Theft To Prevail.**

**A.    Plaintiff Has Proven That Westlake's Attributing Of The Account To Her Was Inaccurate As A Matter Of Law.**

Plaintiff presented more than enough evidence—all of it sworn and disclosed to Westlake—showing she has no connection to the account at issue. (ECF 53 at 3–4.) Westlake's reporting was therefore inaccurate because the account is not hers. Westlake argues that actually proving identity theft is "essential," and that "the accuracy of the reporting, as well as WESTLAKE's reasonable investigation thereof, turns on her alleged status as a victim." (ECF 55 at 3–4.) Westlake unsurprisingly ties these arguments to no

authority, because neither Section 1681s-2(b) nor any case interpreting it requires that a plaintiff's success requires her to prove she is in fact a victim of identity theft. *See Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 850 (E.D. Va. 2017) (granting summary judgment to identity-theft victim on Section 1681s-2(b) claim without any judicial finding that identity theft occurred). Indeed, not even the identity theft report Westlake repeatedly references comes into play. *See Fregoso v. Wells Fargo Dealer Servs., Inc.*, No. CV 11-10089 SJO AGRX, 2012 WL 4903291, at *4 (C.D. Cal. Oct. 16, 2012) ("Nowhere in § 1681s–2(b)—the section that PCC allegedly violated—is there a requirement that a consumer file an identity theft report before he can pursue legal action against a furnisher.").

Accuracy of Westlake's reporting is one aspect of Plaintiff's Motion, and Westlake has failed to raise a genuine issue of material fact as to accuracy, either when it verified the reporting to the CRAs or escalated the disputes to its legal department. Plaintiff has explained and supported through evidence the multiple reasons why Westlake's reporting was inaccurate (ECF 53 at 11–13), and Westlake offers only an attempted re-written record in response. For example, Jose Mata testified that all he did for his investigation of one of Plaintiff's disputes was compare identifying information from the ACDVs with information in Westlake's records. (ECF 52 ¶ 38.) Westlake hopes to belatedly expand on what it did to investigate Plaintiff's disputes, claiming in its brief that "[o]ne key finding during WESTLAKE's investigation concerned the sole payment made on the account," and supports that statement with a citation to its account notes. (ECF 55 at 5.) But the presence of account notes does not indicate that anyone considered them as part of their investigation into Plaintiff's disputes, and Westlake notably does not provide any evidence that such consideration actually occurred. All things considered, however, no one at Westlake has testified under oath that it genuinely believed Plaintiff opened and was responsible for the account and the reasons for that decision. *Wood*, 277 F. Supp. 3d at 850–51.

Similarly, Westlake hopes to bolster its perfunctory investigation with the claim that it called the phone number from which it received a call from the Huntington Beach Police Department. In this newly crafted evidence, Westlake's declarant explains: "Westlake called the cell number pursuant to the caller ID of the purported Huntington Beach Police Department detective and it is not a number associated with the Huntington Beach Police Department." (ECF 55-3 ¶ 19.) It is of course noteworthy that the declarant does not divulge *when* Westlake supposedly made this call, because it was certainly after that declarant, Tracy Bergiman, was deposed as Westlake's Rule 30(b)(6) witness. During that deposition, it was clear that Westlake had not checked the phone number:

**Q.** Is that consistent with Westlake's protocol: The police call, say something is fraudulent, and just -- it just gets notated in an account and doesn't get escalated or anything?

**A.** To be fair, we have no idea if this is an actual police officer or somebody calling in pretending to be a third party.

**Q.** But you could figure that out, couldn't you?

**A.** If we had a police report, which -- it sounded like he took a police report from this person. If we had a police report, we could have used that. But to return a phone call to the police department to follow up on the I.D. theft claim, no.

**Q.** But you could have done that; right? Westlake could have called the police and said, "Hey, did you just call us?" Right?

**A.** Theoretically, yes.

**Q.** Why did you say it that -- why did you say "Theoretically"?

**A.** We -- you know, I guess if you want to say so, yes, we could have. But we get hundreds, if not thousands of people calling in saying that they are somebody who they are not. And if we followed every lead, that's all we'd be doing all day, is following leads.

(PRSUF ¶ 96.) So whatever Westlake may have done about the telephone number, it did so after its Rule 30(b)(6) witness gave this testimony, which was of course years after Westlake's noncompliant investigation of Plaintiff's disputes.

All of Westlake's arguments and evidence are simply attempts to somehow link Plaintiff to the account, but those all fail against Plaintiff's sworn testimony that she did

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

not purchase the vehicle, did not authorize anyone to do that, she did not provide her personal information to anyone to purchase the vehicle, never owned the vehicle, and did not sign the credit application. (ECF 56 ¶¶ 16–17.) Even still, the types of connections to which Westlake points are insufficient to link Plaintiff to the account. *See Jenkins v. Cap. One, N.A.*, No. 14-cv-5683 (SJF) (AKT), 2017 WL 1323812, at \*7 (E.D.N.Y. Feb. 28, 2017) (declining to grant furnisher summary judgment on § 1681s-2(b) claim where defendant claimed "Plaintiff's Credit Card Account statements, checks written to HSBC, and Capital One bank account statements establish that the Accounts belonged to Plaintiff," noting "whether Plaintiff was aware of the Accounts and the charges incurred thereupon does not address the reasonableness of Defendant's investigation into Plaintiff's disputes"). In other words, merely "connecting" information to an account, which is the best Westlake did with Plaintiff's disputes, is not the type of searching inquiry courts demand take place when, like here, a consumer disputes account ownership.

Westlake does not cite a single case showing that "connecting" an account to a consumer is sufficient to find that it is accurate to then report that account as legally attributable to that consumer. That is because there likely is no such case. The reason is simple—using weak internal controls (that, in Plaintiff's case, were intentionally overridden so the loan would go through (ECF 52 ¶¶ 9–14)) to issue loans and then simply data-match information in Westlake's records when someone disputes is not the type of "detailed inquiry or systematic examination" courts regularly recognize as appropriate. (ECF 53 at 14–16 (discussing this issue).) In cases of identity theft such is plainly insufficient because of course the data in Westlake's records matches that in the ACDVs— that is how identity thieves open accounts. Westlake even acknowledges as much by escalating identity theft disputes to its legal department. (ECF 56 ¶ 35 (Westlake's response).)

What Westlake overlooks in all of its discussion is that none of what it points to is enough to confirm that the account genuinely belonged to Plaintiff when she disputed it

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

as resulting from identity theft. Westlake has no evidence that Plaintiff applied for financing or was ever obligated on the account. It has no application signed by Plaintiff, no confirmation of her actual identifying information, no proof Plaintiff acknowledged that the account was hers, so there is no factual dispute on that issue. The account does not belong to Plaintiff, so Westlake's reporting of it as otherwise was inaccurate. Westlake is unable to raise a factual dispute on this element.

Moreover, Westlake wholly ignores Plaintiff's discussion of contract law in this context, and that Westlake could never—under the standards that law imposes—prove Plaintiff is liable on the account. (ECF 53 at 12–13.) Contract law as a simple example that shows the fundamental flaws in Westlake's investigation and reporting. Before and after Plaintiff's disputes Westlake reported to the credit bureaus that the account belonged to Plaintiff, meaning it believed to have had a contract with her in which she agreed to be liable on it. The contract law example reveals, simply, that despite what Westlake communicated to the bureaus, it could never show the existence of such a contract. (*Id*.) Westlake therefore should not have reported to the bureaus, repeatedly, that it verified it did have a contract with Plaintiff. Doing so was inaccurate.

### B. Westlake's Failure To Attach Compliance Condition Codes To The Account Resulted In Further Inaccurate Reporting.

Plaintiff also points out in her Motion that when Westlake responded to the CRAs with its investigation results, it failed to attach one of several possible Compliance Condition Codes (CCCs) to those responses, making the results reported inaccurate. (ECF 53 at 8–9, 21–22.) That failure is no mere accident, as Westlake's dispute investigator testified he never attaches CCCs to dispute results, and Westlake's Rule 30(b)(6) witness and Head of FCRA Compliance did not even know what CCCs are. (ECF 52 ¶¶ 67–68.) Westlake gives this point curt treatment, arguing just that Plaintiff "provides no authority that this is legally required or shown how it may have impeded the investigation and her inadmissible expert report cannot help her escape denial of this motion." (ECF 55 at 21–

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

22.) Here again, Westlake shows its fundamental misunderstanding of the investigation process.

The point of CCCs is not whether failing to include them "impedes" Westlake's investigation, it is to ensure that the reporting of dispute results to the CRAs is accurate. The use of a CCC comes *after* the investigation is complete. When a dispute is *bona fide* and ongoing, as unquestionably was Plaintiff's, it is inaccurate or at least misleading to report investigation results to the CRAs and omit a notation of some kind that the dispute continues even after the investigation results are communicated. *See Gorman*, 584 F.3d at 1163 ("It is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s-2(b)."); *Vasquez-Estrada v. Collecto, Inc.*, No. 3:14-cv-01422-ST, 2015 WL 6163971, at *6 (D. Or. Oct. 20, 2015) (holding that "responding to the 2013 ACDV without correcting the omission of the 'XB' [Compliance Condition C]ode was 'incomplete or inaccurate' within the meaning of the FCRA, entitling plaintiff to summary judgment on his First Claim for negligent noncompliance"); *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 150 (4th Cir. 2008) (holding that a furnisher may be liable for failing to divulge that the debt was disputed if the omission "was 'misleading in such a way and to such an extent that it can be expected to have an adverse effect'") (quoting *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001)). Westlake included no such notations here, and it does not argue—let alone prove—as much in its opposition. The Court should therefore conclude that Westlake's failure to include notations that the account remained in dispute resulted in inaccurate reporting as a matter of law.

## II.   Plaintiff's Other FCRA Lawsuits Are Irrelevant To This One.

### A.   That Plaintiff Suffered Damages Is An Element Of Her Claim.

Westlake takes issue with Plaintiff's discussion of her damages, noting that "[a]lthough one might argue that that an assessment of damages is not directly implicated by the present motion, MILLER repeatedly raises her damages in her motion." (ECF 55

at 16.) That is because for Plaintiff's Motion and the claim at issue, she must show damages as an element on which she seeks summary judgment. *Dane v. U.S. Bank, N.A.*, No. 3:12-cv-00333-ST, 2013 WL 11319046, at *2 (D. Or. May 31, 2013) (setting out elements of claim, including damages). Not any specific *amount* of damages, just that she suffered damages attributable to Westlake's conduct. *Morris v. Equifax Info. Servs., LLC*, No. 2:18-cv-01829-JAD-EJY, 2020 WL 1957550, at *8 (D. Nev. Apr. 23, 2020) ("The plain language of the FCRA provides that a consumer may recover the sum of any actual damages he sustained 'as a result of the failure' of a person to comply with any requirement imposed on him or her under the FCRA."). Since she seeks summary judgment on that element, she must establish its existence as a matter of law. Plaintiff has (ECF 52 ¶¶ 83–87), and all that remains is the jury's conclusions about the amount. Westlake's arguments change nothing because, at best, they may chip away at the amount Plaintiff might recover, without eliminating her ability to recover altogether. Plaintiff's Motion therefore survives on the issue of damages.

**B.  Any Recovery In A Different Lawsuit Would Not Reduce Plaintiff's Damages Here.**

Westlake makes much of Plaintiff's lawsuits against the credit bureaus and other furnishers, arguing that since "[s]he collected from all" of the defendants in those cases— a statement that has zero support in the record—she "is simply seeking a windfall against WESTLAKE, the last defendant standing." (ECF 55 at 11, 2.) These unsupported statements entirely ignore Plaintiff's ability to prove injuries resulting from Westlake's conduct. (*See* ECF 52 ¶¶ 83–87 (setting out damages applicable to Westlake).) Her claims against Westlake stem from its failure to comply with 15 U.S.C. § 1681s-2(b) by not conducting a meaningful investigation of her disputes. This duty of Westlake to investigate is completely separate from any credit reporting agency's duty to investigate a dispute. Indeed, there are separate code sections in the FCRA that govern the investigation duties

of furnishers, such as Westlake, versus those of credit reporting agencies. *Compare* 15 U.S.C. §§ 1681i *with* 1681s-2(b).

Westlake likewise does not consider that the credit bureaus were under an entirely different duty to maintain reasonable procedures to ensure maximum possible accuracy of the information they reported. 15 U.S.C. § 1681e(b). Plaintiff's damages from these violations occurred before Plaintiff made any dispute to any of the bureaus and then to Westlake. In contrast, Plaintiff's FCRA-entitled damages against Westlake arose only after Plaintiff initiated her disputes to the credit bureaus. The actual damages claimed from Westlake's actions flow from its failure to conduct a reasonable investigation of Plaintiff's disputes, which is separate and apart from the credit bureaus' furnishing that data and not conducting their own, independent, reasonable investigation. The injuries caused by Westlake are divisible from the injuries alleged against the credit bureaus, Plaintiff testified as much (ECF ¶¶ 83–87), and Westlake makes no meaningful argument in opposition.

The reason this information is irrelevant is simple—it does not bear any claim or defense. FED. R. CIV. P. 26(b)(1). FCRA litigation is not like a car accident where a plaintiff has one total bill for medical expenses, for example, which is made smaller as he or she settles out with multiple defendants. Under the FCRA, and its sister statute the Fair Debt Collection Practices Act, there is no settlement credit, offset, contribution, joint-and-several liability, or similar doctrine that may be applicable to reduce Westlake's potential dollar liability. *See Nelson v. Equifax Info. Servs., LLC*, 522 F. Supp. 2d 1222, 1239 (C.D. Cal. 2007) (holding no offset is warranted by virtue of plaintiff's settlement with a co-defendant); *see also Zook v. Equifax Info. Servs., LLC*, No. 3:17-CV-2003-YY, 2018 WL 10604347, at *2 (D. Or. July 2, 2018) (collecting cases so holding); *Sloane v. Equifax Info. Servs.*, 510 F.3d 495, 501 (4th Cir. 2007) (rejecting application of the one-satisfaction rule to FCRA case because "in the case at hand, we cannot find, as a matter of law, that [plaintiff] has suffered from a 'single, indivisible harm' that has already been redressed by other parties"); *Brim v. Midland Credit Mgmt.*, 795 F. Supp. 2d 1255, 1266 (N.D. Ala.

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

2011) (holding "[t]here is no right to offset or contribution under the FCRA"); *Kay v. First Cont'l Trading, Inc.*, 966 F. Supp. 753, 754-55 (N.D. Ill. 1997) (right to contribution for violations of FCRA is matter of federal law; contribution not an available remedy); *Irwin v. Mascott*, 94 F. Supp. 2d 1052, 1058 (N.D. Cal. 2000) (no express or implied right to contribution or indemnification under Fair Debt Collection Practices Act); *In re: Ameriquest Mortg. Co.*, No. 05-7097, 2008 WL 630883, at *3 (N.D. Ill. Mar 5, 2008); *Kudlicki v. MDMA, Inc.*, No. 05-2589, 2006 WL 1308617, at *3 (N.D. Ill. May 10, 2006); *Meyers v. Freedom Credit Union*, No. 05-3526, 2008 WL 630883, at *8 (E.D. Pa. Sept. 21, 2007). Thus, any amounts others may have paid for different conduct provides Westlake with no relevant information as to Plaintiff's claims or Westlake's defenses, and certainly provide no basis on which to deny Plaintiff's Motion.

**III.    Westlake Has Not Rebutted Plaintiff's Evidence That Its Investigations Were Unreasonable As A Matter Of Law.**

    **A.    Westlake Does Not Address The Inherent Inconsistency Of Escalating A Dispute To Its Legal Department While Simultaneously Verifying To The CRAs That The Reporting Is Accurate.**

Section 1681s-2(b)'s duty to investigate is absolute and non-delegable, and attaches when a furnisher receives the dispute from the credit bureau. 15 U.S.C. § 1681s-2(b); *Gorman*, 584 F.3d at 1157. Plaintiff has discussed and supported at length her arguments that Westlake's data-matching investigations were inadequate, and addressed as particularly deficient Westlake's uniform process of escalating identity-theft disputes to its legal department while simultaneously verifying to the CRAs that the account belonged to Plaintiff. (ECF 53 at 14–19.) Westlake does not deal with this problem—that it tells its legal department that a dispute requires a more-detailed review while contemporaneously stating to the credit bureaus that it has verified the accuracy of that very reporting—at all. Instead, Westlake confirms the inconsistency, noting again and again in its responses to Plaintiff's undisputed facts that "Westlake's legal department investigates identity theft disputes." (ECF 56 ¶¶ 35, 40, 43.)

Even more remarkably, Westlake confirms that it does not conduct the type of searching inquiry that the Ninth Circuit demands of a dispute investigation. In *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155 (9th Cir. 2009), the court considered what a furnisher must do under Section 1681s-2(b), and adopted the standard that "the plain meaning of the term 'investigation' is a 'detailed inquiry or systematic examination,' which necessarily 'requires some degree of careful inquiry.'" The court further explained what a furnisher's investigation could not be, due to the FCRA's consumer-oriented aims:

> By its ordinary meaning, an "investigation" requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute. Moreover, like the Fourth Circuit, we have observed that "a primary purpose for the FCRA [is] to protect consumers against inaccurate and incomplete credit reporting." A provision that required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry.

*Id.* at 1155–56 (alteration in original, citation omitted). Despite this longstanding holding by the Ninth Circuit, Westlake confirms in its summary judgment declaration that it does precisely what the law says it cannot: "Westlake has credit dispute analysts who conduct *cursory* reviews of disputes." (ECF 55-3 ¶ 20 (emphasis added).) Jose Mata, an individual charged with investigating one of Plaintiff's disputes, is a credit dispute analyst at Westlake. (*Id.* ¶ 21.) And like Plaintiff has said all along and Westlake now admits, Mr. Mata's investigation—and all others Westlake conducted as to Plaintiff's disputes—was cursory. With this admission, Westlake has handed Plaintiff judgment as a matter of law.

Moreover, as explained above, the problem with escalating while simultaneously verifying cannot, as a matter of law, result in a reasonable investigation. The problem is exacerbated in a case like this one because, assuming whatever the legal department does is intended to satisfy Westlake's Section 1681s-2(b) duty, *there is no evidence that the legal department did anything to investigate Plaintiff's disputes*. So, Westlake did nothing. While conducting an unreasonable investigation is sufficient for a furnisher to fail in its duty to investigate, so too is the failure to conduct any investigation whatsoever. *Rahi v.*

*Specialized Loan Servicing, LLC*, No. 21-cv-02717-LB, 2022 WL 1409232, at \*10 (N.D. Cal. May 4, 2022) (noting one element of a Section 1681s-2(b) claim is that "the furnisher failed to investigate the inaccuracies or otherwise failed to comply with the requirements of 15 U.S.C. § 1681s-2(b)(1)(A)–(E)"); *Perez v. ECFC Holdings, Inc.*, No. CV16-4000 DSF (PLAX), 2016 WL 10988574, at \*3 (C.D. Cal. Aug. 2, 2016) ("Individuals can bring claims under 15 U.S.C. § 1681s-2(b) when furnishers of credit information fail to act on a notice of dispute.").

### B.    The Escalation Of Disputes Confirms A Section 1681s-2(b) Violation As A Matter Of Law.

Westlake confirms that it escalates to its legal department disputes involving identity theft, and that it did so with Plaintiff's disputes. (ECF 55 at 13–14.) Yet, Westlake is not clear that it is claiming that such escalation is meant to satisfy its duty to investigate under Section 1681s-2(b). If Westlake is so claiming, then its admission that all it did was send Plaintiff a letter confirms a Section 1681s-2(b) violation. A compliant investigation requires more than just letter writing, and Westlake does not argue otherwise. Should Westlake claim that the escalation is not a Section 1681s-2(b) investigation, then Westlake still violates that Section in escalating disputes.

The problems escalation creates for Westlake are therefore twofold: First, it escalates these disputes, indicating its belief that there may be something to a claim that an account resulted from identity theft, but then reports to the credit bureaus that it has "verified" the reporting as accurate. (ECF 56 ¶ 49 (confirming this fact as undisputed).) It cannot be both—verified as accurate and also in need of a further look by the legal department. 15 U.S.C. § 1681s-2(b)(1)(E) (requiring that information that cannot be verified must promptly either be modified, deleted, or permanently blocked). This circumstance alone is unreasonable as a matter of law, not only because Westlake knows the information it reported about Plaintiff is not truly verified, but because it also does not attach CCCs to the results or promptly notify the CRAs about the status of the account.

Second, Westlake has not provided any evidence at all as to what its legal department did after Westlake escalated Plaintiff's disputes. Section 1681s-2(b) demands an investigation take place upon the receipt of a dispute, so Westlake's duty to investigate arose when the ACDVs from the CRAs arrived. Yet all Westlake claims its legal department did for its investigation was send Plaintiff a letter (ECF 55 at 13–14) which requested information already in Westlake's possession. (ECF 56 ¶ 55.) Westlake provides no evidence that its legal department did anything at all, a separate violation of Section 1681s-2(b) as a matter of law. *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155 (9th Cir. 2009) (adopting the standard that "the plain meaning of the term 'investigation' is a 'detailed inquiry or systematic examination,' which necessarily 'requires some degree of careful inquiry'") (quotation marks omitted).

Whatever Westlake believes it is accomplishing by escalating disputes to its legal department, either option results in a violation of Section 1681s-2(b) as a matter of law.

## C.   Westlake May Not Turn Its Duty To Investigate Onto Consumers.

Westlake repeatedly resorts to the unfounded argument that its investigation was reasonable because Plaintiff supposedly did not assist Westlake in that effort. (ECF 55 at 6 ("Perhaps most importantly, MILLER repeatedly refused to assist WESTLAKE in its investigation."); *id.* at 21 ("Given the still open police report and MILLER's failure to cooperate, the results of the investigation were reasonable based upon what WESTLAKE knew at the time.").)[1] There is of course no statutory basis for suggesting that a furnisher may forego its statutory obligation to investigate a dispute because the consumer is not being as helpful as the furnisher would like. *See* 15 U.S.C. § 1681s-2(b) (setting out no requirements that a consumer participate in the dispute-investigation process). If that were the case, no investigations would ever occur because furnishers could always claim that

---

[1] It is particularly noteworthy that Westlake offers no evidence that it tracked the status of the police investigation, so the status cannot have played any role in the outcome of its investigations of Plaintiff's disputes.

they needed more information and a consumer was not participating to the furnisher's satisfaction.

Westlake's efforts to unload its investigation duties onto Plaintiff are even more stark in a case like this one, where Westlake's legal department—after Westlake repeatedly verified to the CRAs that the disputed account belonged to Plaintiff—sent Plaintiff a letter requesting additional information, most of which Westlake already possessed. (*See* ECF 55-3, Ex. QQ (requesting from Plaintiff a copy of the FTC Complaint and police reports Westlake already knew existed and their respective numbers as well as contacts at the police department; and copies of her drivers license and proof of residency, which she submitted with her disputes).) Westlake provides no details as to why it needed duplicate information to complete its investigation, lodging instead unfounded complaints of Plaintiff's supposed refusal to help. Regardless, Westlake cites no authority for the notion that Westlake could curtail its investigation because Plaintiff did not provide Westlake information it claims to have needed.

To the contrary, the lone case Westlake cites regarding the adequacy of its data-matching process, *Woods v. LVNV Funding, LLC*, 27 F.4th 544 (7th Cir. 2022), supports Plaintiff on this point. While the *Woods* court found the data-matching investigation appropriate in that case, it did so in light of the fact that the original creditor in that case had twice written to plaintiff and stated its conclusion that the account he claimed to have resulted from identity theft actually belonged to him. *Id.* at 550–51. And although the court made that finding specifically under the facts of that case, it also cautioned: "But a word to the wise: this opinion is no license for furnishers to offload their § 1681s-2(b)(1)(A) investigation obligations to consumers by spamming them with requests for additional information." *Id.* at 550. In other words, the court preemptively rejected the very arguments Westlake hopes will gain traction here. The *Woods* court is not alone in rejecting Westlake's position. *See Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1306 (11th Cir. 2016) (disapproving of furnisher's argument that its investigation was

reasonable because plaintiff did not provide information furnisher requested, noting "Midland cites nothing in the FCRA that permits a furnisher to shift its burden of 'reasonable investigation' to the consumer in the case of a § 1681s-2(b) dispute").

**D.    Westlake Has Not Rebutted Plaintiff's Evidence That All Westlake Did To Investigate Plaintiff's Disputes Was Review Its Own Account Records.**

Plaintiff explained in detail the inherent problems with data-matching investigations when the dispute involves identity theft. (ECF 53 at 14–16.) Simply put, it is inappropriate to match identifying information on ACDVs with what is included in the furnisher's records because of course that information will match—that is how identity theft works. Even Westlake's Rule 30(b)(6) witness agreed. (ECF 52 ¶ 82.) Westlake's only response is "courts reviewing furnishers investigations have endorsed this very approach." (ECF 55 at 20 (citing *Woods*, 27 F.4th 544).) That is untrue.

Westlake's reliance on *Woods* does not save its deficient procedure. *Woods* involved disputes of an account resulting from identity theft made to a debt collector not, like here, the original creditor. 27 F.4th at 546. When the consumer disputed directly to the collector, it responded with letters asking for additional information. *Id.* Woods also disputed directly with the original creditor, who sent him two letters confirming its belief that the account belonged to him. *Id.* at 547. Woods sought a police report, and the officer who created the report noted the creditor's conclusions that the account belonged to Woods. *Id.* Woods eventually disputed with the CRAs and triggered the collector's duty to investigate under Section 1681s-2(b), but all the collector did was match Woods' name and address with its account records and verify the reporting as accurate. *Id.* The district court granted summary judgment for the debt collector, finding its investigation was reasonable in light of its consideration of Woods' disputes even before the Section 1681s-2(b) duty kicked in; that it noted the account as disputed to the CRAs; and that the police report favored the collector because it noted the creditor's conclusions that the account belonged to Woods. *Id.*

The court of appeals affirmed, but identified several points unfavorable to Westlake's arguments. Initially, the court noted that data matching is likely not enough, and a more thorough investigation necessary, when the dispute concerns fraud or identity theft. *Id.* at 550. Just as the ACDVs indicated here.

The court further found important the police report, as it told the debt collector that the original creditor had twice concluded that the account belonged to Woods. *Id.* Given that the police confirmed to the collector that the creditor believed the account belonged to Woods, the court did not fault the collector for sending letters to Woods asking for additional information and verifying the reporting as accurate when he did not respond. *Id.*

This case is nothing like *Woods*. As the original creditor, Westlake had far more detailed records than did the debt-collector defendant in *Woods* that should have clued it in that the account did not belong to Plaintiff, yet Westlake ignored that information in favor of its slipshod method of data matching, verifying as accurate, and then escalating the disputes to its legal department. Whereas Plaintiff has identified numerous decisions decrying the data-matching process as a means to comply with Section 1681s-2(b) (ECF 53 at 14–16), Westlake makes no effort to distinguish them and instead responds with a lone decision that came long after its inadequate investigations occurred. *Woods* is—if anything—too little, too late for Westlake.

One additional point bears noting. While Westlake now argues that its process is "court endorsed," its Rule 30(b)(6) witness identified only the Credit Reporting Resource Guide as the source upon which it relied in creating its dispute investigation procedures. (ECF 52 ¶ 77.) Even today, when Westlake crafts a new and conflicting record from that same individual, all it states is "Westlake's dispute investigation procedures are drafted by its Legal and Compliance department based on review of applicable statutes and cases." (ECF 55-3 ¶ 36.) It is difficult to imagine a statement more bereft of detail than that. One would expect that had Westlake truly considered cases like *Woods* in creating its

investigation processes, it would have listed them. Westlake also does not indicate that it even considered *the FCRA* in arriving at its compliance measures, mentioning only "applicable statutes." (*Id.*) Further, Westlake has not heard of *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007), the seminal decision on FCRA willfulness. (ECF 52 ¶ 78.) Westlake's statement certainly does not stand for the proposition that it considered the FCRA or cases like *Woods* in creating its investigation procedures.

## IV. Westlake Does Not Counter Plaintiff's Evidence And Arguments That Westlake Acted Willfully.

Westlake offers nothing in response to Plaintiff's arguments that it willfully violated the FCRA. It merely states: "Because MILLER cannot establish that the investigation was inadequate as a matter of law, she cannot establish 'willful' misconduct, especially given the heightened burden and enhanced remedies." (ECF 55 at 18, 4.) While that may be somewhat true in an academic sense, in light of the record here it is dead wrong.

Westlake again misunderstands the nature of FCRA claims. There is no "heightened burden" Plaintiff must surmount to prove willfulness. Rather, as Plaintiff explained in her opening brief, willfulness arises when a defendant "acts in a manner 'known to violate' the FCRA or acts in 'reckless disregard of statutory duty." (ECF 53 at 23 (quotation marks omitted).) Plaintiff explained in detail how Westlake either knew it was violating the FCRA or recklessly disregarded its statutory duty to investigate and accurately report the results when it verified reporting as accurate before escalating Plaintiff's disputes to the legal department and by mere data matching. (*Id.* at 23–24.) The above statement is all Westlake offers in opposition—no case citations, analysis, or discussion of any evidence showing how its conduct was not knowing or reckless or its procedures were objectively reasonable. The Court should therefore decide this element in Plaintiff's favor.

## V. Plaintiff Is Entitled To Judgment As A Matter Of Law On Her CCRAA Claim.

Westlake gives Plaintiff's CCRAA claims similarly curt treatment, noting just the congruency of the statutes and stating "[l]ike with her FCRA claim, MILLER fails to

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT

establish that WESTLAKE violated the CCRAA as a matter of law, as it cannot be stated that WESTLAKE's reporting was knowingly inaccurate." (ECF 55 at 22.) As with its investigation of Plaintiff's disputes, Westlake fails to give this claim the appropriate attention.

Plaintiff explains concretely how signs from early in Westlake's relationship with the fraudster put it on notice that tying the vehicle account to Plaintiff was suspect. (ECF 53 at 24–25.) She further discusses all of the post-contract information Westlake had— Plaintiff's disputes, a call from the police, police and F.T.C. report information, and Westlake's eventual decision to cease reporting the account despite no new information coming to it. (*Id.* at 25.) Westlake offers little in opposition, relying apparently on its failed arguments that Plaintiff has not met her burden to show the information it reported about Plaintiff was inaccurate or incomplete. (ECF 55 at 22.) Plaintiff has, and Westlake counters that evidence with nothing of its own. The Court should therefore decide this claim in Plaintiff's favor as a matter of law.

## CONCLUSION

Against evidence and authority establishing an absence of dispute of material fact on Plaintiff's claims, Westlake has not raised a triable issue of fact on any aspect of those claims. The Court should therefore grant Plaintiff's Motion and set the case for trial so a jury may determine Plaintiff's actual damages and punitive damages to be assessed against Westlake.

October 14, 2022

Respectfully submitted,

**MELISSA MILLER,**

By: */s/ Craig C. Marchiando*
Craig C. Marchiando (SBN 283829)
Leonard A. Bennett (*pro hac vice*)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel.: (757) 930-3660
Fax: (757) 930-3662
craig@clalegal.com

Octavio Gomez (*pro hac vice*)
**THE CONSUMER LAWYERS**
412 E. Madison #903
Tampa, FL 33602
Phone: 813-299-8537
Mobile: 813 299 8537
Fax:     844-951-3933
Email:  Tav@TheConsumerLawyers.com

*Counsel for Plaintiff*

MEMO IN SUPPORT PARTIAL SUMMARY JUDGMENT